## SCHLENER v. DAVIS. *
### No. 7331.

Circuit Court of Appeals, Fifth Circuit.

Feb. 11, 1935.

Frank Michels and Arthur J. Hughes, both of Chicago, Ill., and Charles R. Pierce, of Miami, Fla., for appellant.

George W. Coleman and Wilbur E. Cook, both of West Palm Beach, Fla., for appellee.

Before BRYAN, SIBLEY, and WALKER, Circuit Judges.

SIBLEY, Circuit Judge.

On June 30, 1932, the First National Bank & Trust Company of Chicago Heights, Ill., failed, and appellant, John L. Schlener, became its receiver. An assessment of 100 per cent. was made on the stockholders. Appellee, Edward R. Davis, Sr., paid the assessment on 34 shares which then stood in his name, but refused to pay that on 250 shares which on September 20, 1930, had been transferred by him on the bank's books to his two sons. Suit at law was brought against him in three counts. The first charged that the transfer was made to finan-

*Rehearing denied March 1, 1935; writ of certiorari denied 55 S. Ct. 656, 79 L. Ed. ——.

cially irresponsible persons with knowledge of the impending failure of the bank and with a purpose to defeat the stockholder's liability; the second, that the transferees were holding the stock in their name for the transferor; and the third was a common count of which no notice need be taken. The case was tried to the judge under a stipulation waiving a jury on an agreed statement of facts supplemented by uncontradicted testimony. Against appropriate motion and exception the judge found in favor of the defendant, and from the resulting judgment the receiver appeals.

In outline the case made is that on September 20, 1930, the sons, William and Edward, Jr., were, respectively, president and vice president of the bank, and their father, then 77 years old, was chairman of the board of directors. Because of ill health and advancing years he was spending the greater part of his time in Florida. The sons proposed to him that he transfer to them 125 shares each of his bank stock as their part in his estate, the whole estate being estimated at $175,000 or more, and there being four other children and a second wife in the family. The bank stock was valued at around $250 per share, and some sold at that price in cash a few weeks later. A written agreement was signed between father, wife, and sons, which recited that at the last marriage there had been an antenuptial agreement with the wife that the estate of the husband and father other than his bank stock should at his death go in equal shares to her and the six children, and that some of the property had subsequently been so divided, and that all had now agreed that the father should forthwith "give and transfer 250 shares of his capital stock of said First National Bank & Trust Company of Chicago Heights to his sons William W. M. Davis and Edward R. Davis, Jr., in equal parts, which shall be in lieu of their shares in the estate of said Edward R. Davis, Sr., at his death," and that by codicil to his existing will certain realty should be devised to the wife and the remainder of his estate of all kinds should be devised and bequeathed to the wife and the four other children, "and that said 250 shares of stock be delivered by the parties of the third part (William and Edward) to the Bank in escrow during the lifetime of the party of the first part (appellee) with instructions to said Bank that all cash dividends on said stock shall be paid to said party of the first part during his lifetime"; and therefore, in consideration of these mutual agreements, the party of the first part had concurrently with the execution of this contract transferred and assigned the 250 shares of stock to William and Edward, Jr., and they had concurrently delivered them in escrow to the First National Bank & Trust Company of Chicago Heights under an escrow agreement between them and said bank, providing, among other things, that all cash dividends declared should be paid to the party of the first part during his lifetime, and that the parties of the third part should have and retain their voting rights on their shares so deposited; that the parties of the third part covenanted not to seek or receive anything further from the estate of the party of the first part; and that the party of the first part should make a codicil to his will as agreed. The agreement between the father, the two sons, and the bank, executed at the same time, reads thus: "Escrow. Parties to escrow: Edward R. Davis, Sr., William W. M. Davis, Edward R. Davis, Jr. Escrow holder: The First National Bank & Trust Company of Chicago Heights. Date of escrow: September 20, 1930. William W. M. Davis deposits in escrow with the First National Bank & Trust Company of Chicago Heights 125 shares of the capital stock of said bank. Edward R. Davis, Jr., deposits in escrow with said bank 125 shares of the capital stock of said bank. Said bank shall hold said certificates for the 250 shares aforesaid in escrow during the life of Edward R. Davis, Sr., (unless he shall in writing consent to the sale or transfer of the same or any part thereof as hereinafter provided) and shall pay to Edward R. Davis, Sr., all cash dividends declared on said 250 shares during his lifetime. Said William W. M. Davis and Edward R. Davis, Jr., shall retain and exercise all voting rights on their respective shares so deposited in escrow. Arrangement satisfactory to said Edward R. Davis, Sr., shall be entered into to assure the payment to him of a sum equal to all dividends declared during his lifetime on shares released from this escrow on his written order or consent. After the death of said Edward R. Davis, Sr., and the payment to him or to his executor of all dividends provided to be paid hereby the shares and/or securities held in this escrow shall be delivered to the respective owners thereof." Appellee indorsed and surrendered certain certificates of his stock and two certificates for 125 shares each were issued in the name of William and Edward, Jr., and placed with the bank. Dividends were declared and paid in January, 1931, and July, 1931, and were passed through them to the bank and there

put to the credit of appellee. The two sons owned other shares in the bank and other property, but in 1930 and 1932 their property was insufficient on failure of the bank to have paid even a 50 per cent. assessment against them.

There was no evidence of the supposed or the actual condition of the bank in September, 1930. Since under 12 USCA §§ 56 and 60 the dividends could have been declared only from earnings after charging off bad debts and other losses, and since the stock was saleable for $250 per share, the bank's condition must be presumed to have been good. There is nothing to show that the transfer of the shares was with knowledge of an impending failure within the meaning of section 64, or was with any fraudulent intent. The burden under the first count was on the plaintiff to show these things. Hodges v. Meriwether (C. C. A.) 55 F.(2d) 29, 86 A. L. R. 52; Jeffreys v. O'Neal (C. C. A.) 64 F.(2d) 284. We agree with the District Judge that the evidence disclosed only a family arrangement (probably a valid one, note to Cole v. Cole, 38 A. L. R. at page 753), whereby the sons, already officers of the bank, should more fully take charge of it and relieve their aging father, and should accept the stock at his death as their part of his estate. The making of elaborate agreements about the estate of a living man is explainable by a desire to prevent trouble between the children and their stepmother. Three letters from father to sons written from Florida several months later which were rejected as irrelevant appear to us to refer to other matters. Nothing in them if admitted in evidence would justify any other conclusion than was reached about count 1.

The question under the second count is whether the transaction of September 20, 1930, conceding its good faith, operated so to transfer the stock as that appellee became no longer a stockholder assessable as such on failure of the bank more than 60 days afterwards. Section 23 of the Federal Reserve Act, 38 Stat. 273, 12 USCA § 64, provides: "The stockholders of every national banking association shall be held individually responsible for all contracts, debts, and engagements of such association, each to the amount of his stock therein, at the par value thereof in addition to the amount invested in such stock. * * *" The old National Bank Act § 12, 13 Stat. 102, in its corresponding provision 12 USCA § 63, spoke of "shareholders," a term which it consis-

tently employed. In Wright v. Georgia R. & Banking Co., 216 U. S. 420, 425, 30 S. Ct. 242, 54 L. Ed. 544, the term "stock" and "share" were distinguished; the one referring to the capital of the company represented in its investments, and the other to the certificate evidencing a subscriber's contribution to the capital and his interest in the company. But it is improbable that the substitution of the word "stockholders" for "shareholders" in the provision for assessment signifies any change of meaning, since the expression "such shareholders" occurs at the end of the new section as referring to the stockholders. Under the old as under the new provision, assessment has often been allowed against the true owner of the stock, no matter in whose name the shares stood. If stockholder has any different meaning from shareholder, it is broader, and better justifies inquiry into the substantial ownership of the interest in the corporation. It is well settled that stock presumably belongs to him in whose name the shares stand on the stock books of the company. A list of the shareholders in a national bank, open to the inspection of the shareholders and creditors, is required to be kept in its business office. 12 USCA § 62. One who knowingly allows the bank's records to show him as a shareholder becomes estopped to deny that he is such, though he be in fact an agent, trustee, pledgee, or dummy. The record owner of national bank stock, save in exceptional cases of fraud or inability to hold stock, is always assessable. The transferees in the present case no doubt are, as they caused the bank's books to show them as being the owners of this stock. But it is equally well settled that the actual owner of stock who does not at the time of the bank's failure or within 60 days before appear as such on the stock record may also be assessed; the title shown by the certificates not being conclusive. See Forrest v. Jack, Receiver, 55 S. Ct. 370, 79 L. Ed. —— (decided February 4, 1935), and cases therein collected. In the case before us the certificates, "the escrow" under which they are held, and the family agreement were executed together as parts of a single transaction, and are to be construed together to ascertain their effect. The contention of appellee cannot be sustained that there was first a complete transfer of the certificates to the sons and then a pledge of them by the sons to secure an obligation to their father, who as a pledgee cannot be assessed, since the shares do not appear in his name. A pledge is based upon a debt. The sons owed their

father no debt. He had an interest in the stock; a direct interest and not a security for any obligation of the sons. He was to get the dividends as dividends when, as, and if, declared. Moreover, there was as it seems to us no perfected transfer of the shares to the sons. The real purpose stated in the family agreement was to give the sons an apparent present title by transfer of the shares instead of a bequest of them by will, so that they might exercise the voting power, but to reserve the dividends to the father for his life, and this was to be done "in escrow," by an "escrow agreement concurrently made." That agreement is headed "Escrow," and it repeats that term nine times in its six sentences. Used by intelligent and experienced business men, who in the family agreement used the terms "devise" and "bequeath" with technical accuracy, it must be given its fair meaning. If the father had simply indorsed his old certificates and placed them with the bank under the agreement, clearly there would have been an unconsummated delivery to be completed at his death according to the accurate meaning of the term escrow. But it appears that he did not have certificates in his own name such that he could thus transfer 125 shares separately to each son, nor would indorsements delivered in escrow have operated to transfer a voting power or an ostensible ownership. New certificates for 125 shares each in the name of the sons, respectively, were issued on surrender of indorsed certificates for exceeding 250 shares (the difference being reissued to the father), and the new certificates issued in the names of the sons were placed in escrow, all as one concurrent transaction. There were special agreements that the transferees were to have the voting power and the transferor the dividends pending the escrow, and that notwithstanding the apparent title in the transferees on the books of the bank they were to have no right to transfer any of the shares except by a new agreement in writing with the transferor. Notwithstanding the apparent transfer of the stock and the words importing that the transferees rather than the transferor put the transferred certificates in escrow, we think that a presently completed and out and out transfer was neither intended nor accomplished. The incomplete transfer left the transferor still the actual stockholder, and assessable as such.

█ But if the transaction was operative to presently vest ownership to any extent in the sons, it was only of a remainder interest after the death of their father; he retaining a life estate. The grant or bequest of the income or profits from property ordinarily passes a corresponding interest in the property itself. Green v. Biddle, 8 Wheat. 1, at page 76, 5 L. Ed. 547; Pollock v. Farmers' Loan & Trust Co., 157 U. S. at page 580, 15 S. Ct. 673, 39 L. Ed. 759. A reservation of profits and income as such ought to have the same effect. In Illinois, where the bank was located and the transaction occurred, life estates and remainders may be created in personal property under the principles applicable to real estate. Cole v. Cole, 292 Ill. 154, 126 N. E. 752, 38 A. L. R. 719. The life tenant of land is the holder of an estate of freehold entitled to possession and profits and liable anciently for all the services for which the land was bound, and its owner in modern times is liable for the ordinary taxes and assessments on the property. He is the owner for the time being. There are numerous cases relating to the rights of life tenants and remaindermen of corporate stock as respects dividends, the rule generally laid down being that ordinary cash dividends declared during the life tenancy are profits going to the life tenant, but accumulations not declared as dividends and stock dividends go to the remaindermen. Gibbons v. Mahon, 136 U. S. 549, 10 S. Ct. 1057, 34 L. Ed. 525. The voting right is an incident of ownership. Fletcher, Ency. Corp. (1931) § 2025. In case of transfer, however, the voting right may be regulated by an agreement not in conflict with public policy. Id. § 2032. When stock is put in trust or in escrow the instrument controls the voting right. Id. § 2035. It seems that the voting right may be controlled by the instrument creating life estate and remainder, though ordinarily it would reside in the life estate. Id. § 2039. These principles applied to this case render the agreed disposition of the voting right of little value in determining the estates vested in the parties. The cases respecting the liability of life tenant and remainderman of corporate stock to assessment are rare. In Forrest v. Jack, 55 S. Ct. 370, 372, 79 L. Ed. ——, the stock was bequeathed to a widow for life, and whatever she might have of it at death to remaindermen. It was said of her: "In this case, the Comptroller's assessment was made more than eleven years after complete distribution and long after decedent's widow as distributee became the actual, though not the registered, owner of the stock and liable under section 64." The question for decision,

however, was not whether she as life tenant or the remaindermen were liable to assessment, but whether the representative of the estate was, and she had an implied power of disposal which perhaps enlarged her estate. Precisely the same situation existed in Blackmore v. Woodward (C. C. A.) 71 F. 321, except that the stock was transferred on the books to the widow. Judge Taft for the court said that the life tenant was assessable, especially when a power of disposal existed, but whatever her title the testator's estate was not assessable. In Alexander v. Dever, 22 Ga. App. 203, 95 S. E. 756, a life tenant was held assessable under a state statute similar to the federal statute. This case alone is cited by Fletcher, § 6348, on the question of assessability of a life tenant. Whatever may be the true rule as between life tenant and remainderman when the life tenant has never owned the stock in fee, we hold that when one who does own national bank stock conveys away a remainder and retains a life estate in himself he continues a stockholder liable to assessment on the bank's failure during his life. It therefore follows that whether the "escrow" suspended the passage of any ownership to the sons until death of appellee, or operated to invest them presently with an ownership in remainder along with a voting right, the appellee continued an actual though not a registered stockholder, and is liable to assessment.

The judgment is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.