### ANDERSON v. ABBOTT et al.

No. 1046.

District Court, W. D. Kentucky.

March 23, 1940.

Crawford, Middleton, Milner & Seelbach, Dodd & Dodd, Allen & Clarke, Humphrey & Taylor, Richard P. Dietzman, Woodward, Dawson & Hobson, and Trabue, Doolan, Helm & Helm, all of Louisville, Ky., for defendants.

SWINFORD, District Judge.

This is a stock assessment suit. National Bank Act, 12 U.S.C.A. § 64. The plaintiff is the Receiver of the National Bank of Kentucky (hereafter referred to as The Bank). The defendants are stockholders in BancoKentucky (hereafter referred to as Banco).

The officers and directors of The Bank, a national banking corporation, in conjunction with the officers and directors of the Louisville Trust Company caused to be organized Banco, a Delaware corporation. At the suggestion of and through information furnished them by these same officers and directors the stockholders of The Bank exchanged 95% of the stock of The Bank for the stock of Banco.

The Plaintiff contends that Banco was organized as a holding company for the stock of The Bank and that its stockholders are in reality stockholders of The Bank and subject to double liability. The defendants contend that Banco was not a holding company but an operating corporation organized to engage in extensive business enterprizes and that while the buying and holding of bank stock was to be one of its functions that was only incidental. In order for the plaintiff to recover he must sustain the burden of proof. Schlener v. Davis, 5 Cir., 75 F.2d 371, 99 A.L.R. 498.

The proof must establish that Banco was a holding company for the bank stock of The National Bank of Kentucky. Whether it was such a holding company by reason of a fraudulent design to avoid a stock assessment or was organized with the purest of motives is of no consequence. The question is was it a holding company for this particular bank stock.

The record discloses a great mass of evidence, both oral and documentary. It is neither practical nor necessary to review all of it in this opinion.

The National Bank of Kentucky was one of the largest and oldest banks in the South. Early in 1927 its capital, surplus and undivided profits were $6,800,000, represented by 25,000 shares of stock of the par value of $100 per share.

Nichols, Morrill, Wood, Marks & Ginter, of Cincinnati, Ohio, and Alfred C. Krieger, of Louisville, Ky., for plaintiff.

In April of 1927 by an arrangement with the Louisville Trust Company (hereafter referred to as the Trust Company) under a unification plan all of the stock of The Bank was transferred to six trustees. Shareholders were given in lieu thereof Trustees' Participation Certificates (T.P. Cs.) The Bank, in November of the same year, also entered into a unification agreement or reorganization plan with the Louisville National Bank and Trust Company, which finally resulted in a merger in January, 1929.

As early as October, 1927, the National Bank examiner began to criticise certain large loans made by The Bank as sources "of potential danger of the bank", and suggested that diligent effort be made to collect what he termed "these substandard assets".

The Comptroller of the Currency on December 12, 1927, addressed a letter to the Board of Directors of The Bank in which he said the report of examination shows The Bank to be in a "most unsatisfactory condition" and seemed to "be growing worse". He then pointed out many things that should be corrected and called attention to "abnormal" over-drafts and items of credit which were termed "dangerous".

In the examination of The Bank in March of 1928 many of these criticisms were repeated and emphasized. In October of the same year the Chief National Bank Examiner in a report listed the more dangerous items and pointed out that there were overdrafts aggregating $271,502.88, "the largest amount of published overdrafts" that had ever come to his attention. That overdue loans amounted to $1,768,112.-28, and that this item was "much too large". Slow and doubtful loans of over six million dollars should receive "vigorous attention". These and many other criticisms were directed to the attention of the directors by the National Bank Examiners and the office of the Comptroller in reports and letters.

Evidence is produced to show that from February 11, 1927, when the merger of The Bank and Trust Company started, to May 25, 1929, The Bank's deposits had shrunk from $56,736,000 to $35,089,000, a decrease of $21,647,000, or 38 per cent.

The average daily borrowings went from $3,830,018 during February, 1929, to $12,-546,262. The Bank was deficient in its legal reserves on 72 days from January 4, 1929, to July 15, 1929, in amounts up to $1,972,385.

It was during this time beginning in February, 1929, that Banco was conceived in the minds of the officers and directors of these unified banking houses. This proposed new corporation was discussed and organized throughout the months from February to September, 1929. It was incorporated under the laws of the State of Delaware on July 16, 1929.

On July 19, 1929, there was sent out to all holders of Trustees' Participation Certificates a letter advising them of the formation, incorporation and avowed purposes of Banco. This letter was signed by Mr. James B. Brown, as President of the National Bank of Kentucky, Mr. Richard Bean, as President of the Louisville Trust Company, by the six trustees and by the directors of the merged Bank and Trust Company.

I quote this letter in full as I feel it is important to an understanding of this opinion.

The letter is as follows:

"To the Holders of Trustees' Participation Shares,

"National Bank of Kentucky and The Louisville Trust Company:

"1. Your Officers and Directors have studied the rapidly changing conditions in the banking business in America, with a view to preparing the two banking institutions under their management, to meet these changed conditions, and to take early advantage of new opportunities presented thereby.

"2. The conclusion unanimously reached, as a result of their deliberations, is that the two banks, and the business conducted by them, should be reorganized by adding to this group a third corporation, which will make the operations of these banking institutions more profitable, expand their facilities, and thus develop for the entire group new and profitable financial opportunities and connections.

"3. Such a reorganization is in line with the trend of business and finance in this country; and the strength and influence of the new corporation will not only greatly benefit the two banks and the territory they now serve, but will also be a stabilizing influence in banking circles throughout this section of the country. The new corporation can exercise many profitable and important functions which neither a bank nor a trust company has authority to exercise,

and can take advantage of many sound and profitable financial opportunities, frequently presented in the course of business of the two banks, but not available to them, because of the restrictions upon their powers and activities.

"4. The following is the Plan of Reorganization agreed upon by the Officers and Directors of the two banks, and approved by formal Resolutions of the Trustees, under the Trustees' Agreement for the National Bank of Kentucky and The Louisville Trust Company.

"5. There has been organized under the laws of the State of Delaware, a corporation known as The BancoKentucky Company, with an authorized capital of 2,000,000 shares, having a par value of Ten ($10.00) Dollars each. The stock will be exchanged or sold, in accordance with this Plan, on the basis of Twenty-five ($25.00) Dollars per share, which will give the Company a capital of Twenty Million ($20,000,000.00) Dollars, and a surplus of Thirty Million ($30,000,000.00) Dollars, or a total capital and surplus of Fifty Million ($50,000,000.-00) Dollars. No stock will be sold by the Company at less than Twenty-five ($25.00) Dollars per share.

"6. The corporation is given broad charter powers, including the right to acquire stocks, bonds and other securities of other corporations, and evidences of indebtedness created or issued by other corporations; the power to underwrite securities and take part in syndicate management, and to charge fees and commissions for its services in connection with the reorganization or refinancing of other corporations; the power to issue bonds and to guarantee the obligations of others and to become surety, guarantor and endorser thereof. The foregoing is merely a brief summary of the broad powers given the corporation; complete details of these powers appear in the Certificate of Incorporation of the Company, copies of which may be examined at the offices of the two banks by any one interested.

"7. It is an essential part of this reorganization that the shares of this corporation (or at least a substantial majority thereof) be owned by the Trustees' Participation Shareholders, and that it be managed and operated by the Boards of Directors and the officers of the two banks. The BancoKentucky Company, therefore, offers to the Trustees' Participation Shareholders of the National Bank of Kentucky and The Louisville Trust Company, through the Trustees as agents in the transaction, its entire capital stock, on the bases and subject to the terms and conditions hereinafter set out:

"8. It is an essential part of this Plan that:

"(a) On or before September 19, 1929, the holders of the Trustees' Participation Shares must deposit their Certificates with the Trustees for exchange into the shares of The BancoKentucky Company; and for each Participation Share thus deposited, the Trustees will cause to be issued to the holder thereof, Two (2) shares of the stock of the new corporation. In addition thereto the depositing shareholder will have the right to subscribe for as many additional shares of the stock of The BancoKentucky Company as he may desire at the price of Twenty-five ($25.00) Dollars per share subject to allotment ratably if over-subscribed. Trustees' Participation Shareholders who fail to deposit their shares on or before September 19, 1929, will be deemed to have waived their rights to thus exchange their shares and subscribe for stock in the new Company, unless the Trustees shall extend the time for deposit and subscription (as they may do in their discretion), in which event the Trustees' Participation Shareholders will be deemed to have waived their rights, unless their shares are deposited within the extended time.

"(b) The entire Plan of Reorganization, and the deposit and subscription privileges and rights hereinabove set out, are all, and each of them is, conditioned expressly upon the acquisition by the Trustees' Participation Shareholders, either by deposit for exchange, or by direct subscription as above, of at least a majority of the shares of The BancoKentucky Company; and further conditioned upon the acquisition by The BancoKentucky Company of at least a majority of the Trustees' Participation Shares issued and oustanding as of September 19, 1929.

"9. It is the unanimous recommendation of your Officers, Directors and Trustees of the National Bank of Kentucky and The Louisville Trust Company, that the Trustees' Participation Shareholders immediately deposit their shares under this Reorganization Plan, and that they exercise their right to subscribe to the additional shares of stock of the BancoKentucky Company.

"10. There is enclosed herewith a subscription form covering this transaction,

which you are asked to sign at your earliest opportunity and deposit with the Trustees, at their office, 421 West Market Street, together with your Certificate or Certificates for Trustees' Participation Shares, endorsed in blank and witnessed. There will be issued to you an Interim Receipt for the shares deposited which, when the Plan has become effective as above set forth, may be presented for exchange for the permanent certificates of the BancoKentucky Company, in accordance with the Plan of Reorganization."

Complying with the recommendation contained in this letter, the stockholders of 95% of the stock of The Bank exchanged their T. P. Cs., representing the stock of The Bank, for the stock of Banco.

This was done by September 16, 1929, and on September 19, 1929, Banco was launched for business.

The directors of Banco were all directors of the Trust Company and of The Bank. The trustees were directors either in the Trust Company or The Bank, or both, and were also directors of Banco.

It is further pointed out that in statements and letters of the directors and officers of The Bank and The Trust Company, Banco was referred to as a holding company and the suggested preface to the prospectus which it was proposed to send to the shareholders recited that the officers and directors had been "considering a reorganization of your banking institutions * * * in which the first step to be taken by our shareholders in this reorganization is the creation of a third corporation."

It was provided in Banco's charter: "The private property of stockholders shall not be subject to the payment of corporate debts to any extent whatever."

It is not contended by the plaintiff that The Bank was insolvent in any sense of the word when Banco was organized or the holders of T. P. Cs. exchanged them for stock of Banco with knowledge of the impending failure of The Bank or that they actually knew of the condition of The Bank in 1929. But, that the officers and directors of The Bank, organizers of Banco, did know that it was in a failing condition and that T. P. C. holders are chargeable with constructive knowledge.

In his report of October 27, 1928, just before Banco was first discussed in February, 1929, National Bank Examiner, John S. Wood, estimated losses in The Bank as of that time at $115,761. This amount was charged off during the examination leaving in The Bank its capital of $4,000,000, surplus of $2,000,000, and undivided profits and reserves of $771,010.

The regular quarterly dividend of $160,000 had been declared through May, 1929, without criticism of the bank examiner.

Banco secured from T. P. C. holders and the stock buying public $10,000,000 for 400,000 shares of stock, and after being launched in September, 1929, immediately proceeded to purchase stock in other banks. It also bought a small amount of insurance stock.

In January, 1930, it increased its capital to $50,000,000. This was made necessary partially by a sale of 250,000 shares to one customer.

In May, 1930, Banco entered into a contract with Caldwell and Company for a half interest in that company. Caldwell and Company was generally known to be the largest investment and securities house in the South and its financial soundness was unquestioned. The Secretary of Caldwell and Company testified that it did a gross business in 1929 of $75,000,000, and of $37,000,000 in the first five months of 1930.

Banco had its own capital and cash resources much larger than the capital and total resources of The Bank. Six hundred and forty-six T. P. C. holders bought Banco stock. The total amount of certificates owned by this number of shareholders was 143,762 of the par value of $10 per share. The same individuals purchased or subscribed for an additional 178,878 shares of Banco stock at a price of $25 per share. The directors, who were the organizers of Banco, had a total of 76,115 T. P. Cs. of the par value of $10 per share. They subscribed for 47,188 shares of Banco at $25 per share.

On November 16, 1930, the directors of The Bank resolved to suspend the further operation of The Bank. The following day, November 17, 1930, the comptroller appointed a receiver.

As a result of the closing of The Bank, Banco was placed in a precarious position which resulted in the filing of a petition on November 24, 1930, by six stockholders of Banco, individually and as executive committee of Banco against Banco praying that a receiver be appointed for Banco.

Banco entered its appearance and confessed the allegations of the petition and a

receiver was appointed. The receiver of The Bank proceeded against the receiver of Banco for the amount of the assessment and secured a judgment.

The record further contains evidence of the following facts urged by the defendants as positive proof that Banco was not merely a holding company but was an operating business corporation and that owning the stock of The Bank was only incidental to its avowed and actual purposes and functions.

That at all times prior to the formation of Banco and during the months it was under discussion that 'The Bank was in such a sound financial condition that future insolvency of The Bank never occurred to anyone connected with it. That the capital and surplus were intact and in addition it had undivided profits of never less than $234,000.

That the report of National Bank Examiner Wood of May 25, 1929, which is strongly urged upon the attention of the Court by the plaintiff, was not reported to the Board of Directors until August 23, 1929.

That there was a general belief that the locality needed a business house such as the proposed Banco to do a so-called general investment banking business, to underwrite and float bond and stock issues, and to carry on many legitimate business enterprises to make money but which were prohibited to the banks.

I have in this statement of facts undertaken to give many of the important features of the evidence on which each side relies to sustain its case. I have not undertaken to set out all of the facts or all of the important facts. The record is so voluminous and there are so many details from which inferences have been drawn in briefs that it would be entirely impracticable to state all of them. Much of the evidence is wholly irrelevant and immaterial to the issues presented.

■■ The liability of the defendants is entirely statutory. They must be stockholders in The Bank. If they are stockholders in reality, regardless of an intermediate corporation, they are subject to the assessment. They are not stockholders in The Bank if Banco was an operating company and not merely a holding company.

■ Courts are slow to recognize any corporation that has apparently defeated the purposes of the statute. The general public is invited to deposit its money in banks and thus place it in the care of those charged with the affairs of the bank. But the law requires that a bank should be a bank and not a business house. Deposits are made and credit extended to banks with utmost confidence. The depositor and creditor know, either actually or with some general understanding that if those in charge of the affairs of the bank or those who profit as stockholders by reason of that deposit lose the money through credits or investments they are required to put back from their private estates a certain amount to cover or at least partially cover the loss.

■ Efforts have been made repeatedly to avoid the provisions of the "double liability" statutes. The Courts have consistently upheld the statutes both in the letter and in the spirit. Stockholders cannot accept the benefits derived from bank stock on the one hand and avoid the statutory liability on the other. Barbour v. Thomas, 6 Cir., 86 F.2d 510.

■ The courts will lift the corporate veil of a sham corporation and find the beneficial and true owners of the bank stock. Laurent v. Anderson, 6 Cir., 70 F.2d 819; Pauly v. State Loan & Trust Co., 165 U. S. 606, 17 S.Ct. 465, 41 L.Ed. 844; Early v. Richardson, 280 U.S. 496, 50 S.Ct. 176, 74 L.Ed. 575, 69 A.L.R. 658; Nettles v. Rhett, 4 Cir., 94 F.2d 42; Ohio Valley National Bank v. Hulitt, 204 U.S. 162, 27 S. Ct. 179, 51 L.Ed. 423; Christopher v. Norvell, 201 U.S. 216, 26 S.Ct. 502, 50 L.Ed. 732, 5 Ann.Cas. 740; O'Keefe v. Pearson, 1 Cir., 73 F.2d 673, 97 A.L.R. 1243; Corker v. Soper, 5 Cir., 53 F.2d 190.

Stockholders who protest that they had no knowledge of any fraudulent purpose in the setting up of the corporate shell have not been excused. Metropolitan Holding Company v. Snyder, 8 Cir., 79 F.2d 263, 103 A.L.R. 912; Fors v. Farrell, 271 Mich. 358, 260 N.W. 886.

■ Each case must, of course, rest on its own facts. I do not believe that the proof in the case at bar brings it within the rule. On the contrary I am of the opinion that Banco was established for its avowed purposes, with no thought, on the part of any of its organizers, of avoiding double liability on their bank stock.

■ The Court takes cognizance of the fact that at the time of the organization this country was probably in the highest state of credit inflation it has experienced.

I do not think that the officers of the bank who suggested the formation of Banco entertained any suspicion that The Bank would ever fail. They were not looking for a holding company for the stock of The Bank, but for an associate corporation of The Bank with unlimited charter powers through which they could express financial genius hitherto unknown in the Ohio Valley. They were suffering not so much from fear of impending disaster, but from a Napolionic complex not uncommon to the times.

The stockholders and directors obligated themselves to pay more for the new issue of stock than their liability would have been on the stock of the Bank they held. The holders of T. P. Cs. had at the time Banco was formed a potential assessment liability of $1,437,620 in the event both The Bank and Trust Company failed. Their obligation for new stock purchased in addition to that exchanged was $4,471,950. The directors greatest potential assessment on the T. P. Cs. held was $761,150. The directors purchased new stock in Banco for $1,179,750. They thus actually paid out or were obligated to pay more than their full assessment could have been.

I do not believe the decision in the case of Atherton v. Anderson, 6 Cir., 86 F.2d 518, is res judicata of this case but it is certainly strong authority for the proposition that Banco was in reality what its sponsors claimed it to be in their letter of July 19, 1929. Kentucky Coal Lands Co. v. Mineral Development Co., 6 Cir., 219 F. 45.

I quote certain language of the opinion in the Atherton case which I consider very appropriate [86 F.2d 536]: "We come then to the question whether the relation between the bank and the Banco Kentucky Company was such that a court of equity would be warranted in disregarding the existence of Banco as a separate corporate entity. It is true that Banco was conceived in the vaulting imagination of the president of the bank; that it was promoted and fostered by the appellants; that the directorates of the two corporations, though not identical, overlapped; that the great majority of trust participation certificates representing stock in the bank became the property of Banco, and that there is a suggestion of identity in the name adopted for the new company. But Banco was not a mere holding company for the bank's stock.

It was organized for clearly defined purposes, too optimistically conceived, perhaps, but neither illegitimate nor unlawful. It had its own capital with cash resources at one period almost twice the entire capital and surplus of the bank. While in the very beginning the bank stock may, as found by the court, have been its principal asset, and may have continued thereafter to be its most valuable single asset, it had other assets of very substantial value, and it was warrantable inference at the time of its organization and for a substantial period thereafter that it could well meet any assessment that might be levied upon it as a stockholder of the bank. At any rate there is nothing in the record to point to its creation for the purpose of escaping such assessment. Indeed when the assessment was finally made by the Comptroller it was enforced against Banco and not against the stockholders. See Laurent v. Anderson, supra. Its separate corporate existence was recognized by the very receiver on whose behalf we are now asked to ignore it."

The facts do not establish that Banco was an empty shell, but a very real entity actively acquiring capital assets. To hold otherwise is to deny an established fact. Laurent v. Anderson, 6 Cir., 70 F.2d 819.

There were in fact interlocking directorates and Banco controlled The Bank, but this identity of stockholders and ownership of stock does not merge them into one corporation. Pittsburgh & Buffalo Co. v. Duncan, 6 Cir., 232 F. 584; Kentucky Electric Power Co. v. Norton Coal Mining Co., 6 Cir., 93 F.2d 923.

Although never consumated, Banco's contract to purchase a half interest in Caldwell and Company was a step toward carrying out its avowed purposes.

A review of the record is convincing that while there were irregularities in the handling of some of the credit accounts and some of these accounts had become much too large the soundness of The Bank and its ability to meet its obligations could not be questioned until long after the formation of Banco.

Courts should not lose sight of the fact that many things which occurred in the late twenties may appear now to be both careless and corrupt. Many small men were pushed into positions of great power. Many men of character and ability were lulled into a false sense of security.

In the financial world apparently everything succeeded. Success was measured in terms of bigness and mass production. Unfortunately banks which we had learned to think of as safe investments for stockholders and security for savings in many instances led the parade in speculating with the funds entrusted to them.

The crash of October, 1929, was inevitable, but unexpected. We must realize that after all many institutions that failed would have been heralded as great successes for a few years at least had they been started in 1926 or 1927. Take for example the complex financial structure built up as Caldwell and Company. I am inclined to believe that BancoKentucky would have had a brilliant career of a few months if it had been launched in 1927 instead of 1929.

I do not mean that the courts should modify their judgment or depart from time honored principles of equity by constantly referring to the distinction between the fanciful prosperity of the late twenties and the grim realities of the early thirties.

We have used the "depression" as an excuse for too many things already. It should, however, be borne in mind in considering the motives in the minds of the organizers of Banco at the time it was discussed and finally chartered.

Interlocking directorates may not contribute to the free competition so necessary to the health and well being of the body politic, but they were not unlawful. It may not have been good business to organize Banco and purchase its stock with T. P. Cs., but there was nothing in the law that prohibited it. A corporation could buy bank stock, either with money or by an exchange of stock. Citizens' Bank of Shelbyville v. Mutual Trust & Deposit Co., 206 Ky. 86, 266 S.W. 875, 40 A.L.R. 1001.

It is my opinion that Banco was not merely a holding company, but was formed for the purposes set out in the letter of July 19, 1929, and for no other purpose. That it was not formed as a medium or agency through which to avoid double liability on the stock of The Bank. The stockholders of Banco are not stockholders of The Bank within the meaning of the statute.

The plaintiff's bill should be dismissed. Counsel will submit findings of fact, conclusions of law and judgment in accordance with this opinion.