**ANDERSON v. ABBOTT et al.**

**TELLMAN et al. v. ANDERSON.**

Nos. 8852, 8853.

Circuit Court of Appeals, Sixth Circuit.

May 4, 1942.

Robert S. Marx, of Cincinnati, Ohio (Frank E. Wood, Edward M. Brown, Harry Kasfir, William C. Kelly, and Nichols, Wood, Marx & Ginter, all of Cincinnati, Ohio, and Alfred C. Krieger, of Louisville, Ky., on the brief), for appellant and cross-appellee A. M. Anderson.

W. W. Crawford, of Louisville, Ky. (Richard P. Dietzman, Allen P. Dodd, A. C. Van Winkle, James W. Stites, Henry E. McElwain, Edward P. Humphrey, and Lafon Allen, all of Louisville, Ky., on the brief), for appellees Katherine Kirkpatrick Abbott and others.

Henry M. Johnson, of Louisville, Ky. (Lucian L. Johnson, of Louisville, Ky., on the brief), for cross-appellants Susie E. Tellman and others.

Before SIMONS, ALLEN, and MARTIN, Circuit Judges.

MARTIN, Circuit Judge.

This court must again travel the tangled trail of ramifications resultant from the failure of the National Bank of Kentucky.

In an action brought by the receiver of that institution, double liability assessment under 38 Stat. 273, 12 U.S.C.A. § 64, was upheld against the receiver of Banco-Kentucky Company, a Delaware corporation, as the real and beneficial owner of the national bank stock by virtue of its position as holder of participation certificates issued by trustees, who, for the benefit of Banco-

Kentucky Company, held the bare legal title to a vast majority of the shares of the assessed capital stock of the National Bank of Kentucky. Laurent v. Anderson, 6 Cir., 70 F.2d 819.

Only $90,745.17 of the judgment for $3,771,464.22 entered in that case was satisfied. In the present action, the receiver of the National Bank of Kentucky seeks to recover from the stockholders of Banco-Kentucky Company, on the basis of their proportionate stockholdings, the difference, with interest, between the amount of the judgment awarded the national bank receiver against the BancoKentucky Company and the amount collected by him.

After receiving and considering voluminous evidence, which in the printed record on this appeal comprises 212 exhibits contained in five volumes and 913 pages of testimony, a part of which is in condensed form, the district court dismissed the instant action brought by the receiver. The grounds of dismissal appear in the trial court's opinion (D.C., 32 F.Supp. 328) and in its findings of fact and conclusions of law.

On appeal, the national bank receiver renews his contention that the stockholders of the BancoKentucky Company are shareholders of the National Bank of Kentucky, within the meaning of the federal assessment statutes. He states the essence of his case to be that owners of national bank stock cannot organize a commercial corporation to hold their bank stock, channel the dividends on the bank stock to themselves through the holding company, and then interpose the corporate entity as a shield against the assessment liability imposed upon "the actual owners of the capital of a national bank, that is, those who have their money invested therein."

The rejoinder of the appellees is that BancoKentucky Company was an independent corporation and real owner of the doubly-assessed stock of the National Bank of Kentucky, and has been held liable in such capacity; and that the stockholders of BancoKentucky Company were not shareholders of the National Bank of Kentucky within the meaning of the federal stock assessment statutes.

No useful purpose would be served by repetition of the historical background of this case. On the contrary, it would seem more appropriate not to repeat descriptive narrative which can be found in numerous reported cases in this circuit.

The merger and unification of control and management of the National Bank of Kentucky and the Louisville Trust Company through the issuance of trustees' participation certificates, the terms and conditions upon which the certificates were issued, the organization of BancoKentucky Company and the underlying purposes thereof, and the acquisition by Banco of the trustees' participation certificates have been described and discussed, not only in the published opinion of the court below (32 F.Supp. 328) and in Laurent v. Anderson, supra, but also in Anderson v. Akers, D.C.Ky., 7 F.Supp. 924, 947, et seq.; and, on appeal therefrom, in Atherton v. Anderson, 6 Cir., 86 F.2d 518, 534, et seq.

Moreover, in litigation instituted by the receiver of the national bank against its officers and directors to impose liability upon them for the bank's losses, this court, in Atherton v. Anderson, supra, and in Atherton v. Anderson, 6 Cir., 99 F.2d 883, has described and discussed in detail the operations of the National Bank of Kentucky and the BancoKentucky Company and the transactions which led to the failure of the national bank, and the subsequent collapse of the BancoKentucky Company. Pertinent factual statement will also be found in the opinion of the Court of Appeals of Kentucky in BancoKentucky's Receiver v. Louisville Trust Co.'s Receiver, 263 Ky. 155, 92 S.W.2d 19, which was a successful action to recover statutory double liability, assessed under the laws of Kentucky, against BancoKentucky Company as the beneficial owner of shares of the capital stock of the Louisville Trust Company.

Without undue repetition of what we have said in Laurent v. Anderson, supra, and the two Atherton v. Anderson cases, supra, we shall limit discussion of the facts to salient points which appear to direct the way to correct decision.

In the consummation of the plan of unification of the National Bank of Kentucky and the Louisville Trust Company, it was carefully provided that the six trustees holding legal title to the stocks of the two banking institutions should not be personally liable as shareholders, but that each owner of a trustees' participation certificate should be subject to the same liability thereon as if he were owner of record of the proportionate number of bank stock shares held in trust for him. Insofar as attaching liability for double assessment was concerned, the trustees' certi-

ficates were the equivalent of bank stock; and holders of such certificates were the real beneficial shareholders of the National Bank of Kentucky.

But, in the certificate of incorporation issued by the state of Delaware to Banco-Kentucky Company, it was distinctly provided that the private property of the stockholders should not be subject to the payment of corporate debts to any extent whatever, and the shares of that company were described in each stock certificate as "full paid and non-assessable." In the prospectus of the BancoKentucky Company, dated July 19, 1929, mailed to the holders of trustees' participation certificates, it was stated that the new corporation could exercise many profitable and important functions which neither a bank nor a trust company is authorized to exercise, and could take advantage of many sound and profitable financial opportunities frequently presented in the course of business of the two banks but not available to them because of the restrictions upon their power and activities.

It was further pointed out in the prospectus that the broad charter powers of the new corporation would include the right to acquire stocks, bonds, securities, and evidence of indebtedness of other corporations; the power to underwrite securities, to participate in syndicate management and to charge fees and commissions for services in the reorganization or refinancing of other corporations; and the power to issue bonds, to guarantee the obligations of others, and to become surety, guarantor and endorser thereof.

The unification of the National Bank of Kentucky and the Louisville Trust Company was consummated under the trustees' participation certificate plan by an agreement dated April 22, 1927. A week later, market quotations of the National Bank of Kentucky shares of par value of $100 each were $470 bid and $485 asked. Quarterly dividends of four percent were paid regularly on the national bank stock up to the time of the incorporation of the Banco-Kentucky Company on July 16, 1929; indeed, were so paid up to the closing of the national bank on November 17, 1930. None of these dividends was criticized by the Comptroller of the Currency in his letters to the bank, or in the reports of the examiner. On June 14, 1929, a month before BancoKentucky Company was incorporated, the official reports of the National Bank of Kentucky to the Comptroller of the Currency showed a capital of $4,000,-000, a surplus of $2,000,000, and substantial undivided profits.

No probability of double liability assessment appeared at the time the holders of trustees' participation certificates exchanged the same for shares of BancoKentucky Company. At the time BancoKentucky Company was organized, its directors, who owned 76,115 trustees' participation certificates carrying a maximum statutory assessment liability of $761,150, exchanged their participation certificates for 152,230 shares of BancoKentucky stock. They subscribed for an additional 47,188 shares of Banco, for which they paid $1,179,750 in cash. Moreover, of the 2,225 holders of trustees' participation certificates prior to the organization of Banco, 646 of them purchased for $4,471,950 cash 178,878 shares of BancoKentucky stock at $25 per share. This investment in Banco was in addition to their exchange of trustees' participation certificates for stock in Banco. At the time, the trustees' certificates had a market value of "46 bid and 48 asked."

A survey of all the evidence in the case impels the conclusion that the BancoKentucky Company was organized for the purposes declared in its prospectus, and not for the purpose of affording escape by holders of trustees' participation certificates from double liability assessment on bank stock.

Immediately after the closing date for deposit and subscription to BancoKentucky stock, pursuant to the terms of the prospectus, the board of directors, in view of the almost unanimous exchange of trustees' participation certificates for Banco-Kentucky stock, adopted plans to amend the charter of the latter, so as to increase its capital from two million shares to five million shares; and, in January, 1930, the charter was so amended. Contracts with brokers were authorized for the sale of its shares to the public. On July 1, 1930, Banco stock was held by 6,000 stockholders.

The BancoKentucky Company collected on call and from subscribers to its stock $25 per share for 394,786 shares, or $9,869,-650 in cash—a wholesome asset. More than half of this amount was furnished by investors who were not holders of trustees' participation certificates.

An excess of $3,000,000 of the cash realized by Banco from sales of its shares

was not invested in bank stocks; but on November 17, 1930, the aggregate par value of bank stocks owned by BancoKentucky Company had reached $7,770,780. The BancoKentucky Company acquired, during the period between September 25, 1929, and November 22, 1930, either by cash payment or by exchange of its stock, or by both, controlling stock interests in Pearl-Market Bank and Trust Co., Cincinnati, Ohio; Brighton Bank and Trust Co., Cincinnati, Ohio; Central Savings Bank and Trust Company, Covington, Kentucky; Peoples-Liberty Bank and Trust Co., Covington, Kentucky; First National Bank of Paducah, Kentucky; Ashland National Bank, Ashland, Kentucky; Security Bank of Louisville, Kentucky; and the Mechanics Trust and Savings Bank, Paducah, Kentucky.

But it acquired, also, 625 shares of Union Central Life Insurance Company stock; a $2,000,000 note of James B. Brown, President of the National Bank of Kentucky; a $588,000 note of Murray Rubber Company of Trenton, N. J.; a $20,000 participation in a note of Louis C. Humphrey; and contracted, on May 28, 1930, for the purchase of 10,000 shares of Caldwell and Company, an expansive investment corporation, in a trade which was not fully consummated.

The deal between Banco and Caldwell and Company was much publicized; and, following the failure of the latter on November 5, 1930, some twelve million dollars was withdrawn from the National Bank of Kentucky by its depositors. The national bank went into the hands of a receiver on November 17, 1930; and, on November 24, 1930, a petition for receivership was filed in a Kentucky state court against the BancoKentucky Company and thereafter a receiver was appointed. On February 20, 1931, the Comptroller of the Currency assessed the stockholders of the National Bank of Kentucky on the full par value of its capital stock of $4,000,000; and, on March 20, 1931, the receiver of the national bank notified the stockholders of Banco-Kentucky Company that it was his intention to proceed against them for the collection of the assessment liability represented by trustees' participation certificates held by the BancoKentucky Company to the extent that he should be unable to collect such assessment from the BancoKentucky Company or its receiver.

A few days later, the receiver of the National Bank of Kentucky filed suit in the United States District Court for the Western District of Kentucky for recovery of more than $14,000,000 from the bank's directors, on the predicate of their alleged violation of federal statutes and their alleged common law negligence. That civil action has been finally determined by this court in the two Atherton v. Anderson cases, supra.

As has been stated, final judgment has been rendered against the receiver of BancoKentucky Company as the real and beneficial owner of the stock of the National Bank of Kentucky involved herein. Laurent v. Anderson, supra. We are now asked to take the advanced, if not inconsistent, position that the stockholders of the BancoKentucky Company, also, are liable as shareholders of the National Bank of Kentucky, "within the meaning of the federal stock assessment statutes."

The appellant receiver contends that the BancoKentucky Company was intended primarily and functioned exclusively as a holding company for bank stocks, was publicly known as such, and was created to "hold and control banks in the Ohio Valley"; that the stockholders of the national bank were solicited to exchange their bank stock, held in the form of trustees' participation certificates, for stock of the holding company to enable the bank to reorganize and to expand by acquiring a chain of banks; that, throughout the existence of the holding company, substantially all of its income was received from bank-stock dividends, which were channeled to its shareholders; that the dividends received by the national bank stockholders who exchanged their trustees' certificates for shares in Banco were the same in amount as had been received by them prior to the exchange; and that the BancoKentucky Company was "run by and for the bank and bank shareholders."

Appellant points to evidence that the BancoKentucky Company paid no salary or fees to its officers, directors, or employees; maintained no separate offices, and incurred no office expenses; that Banco kept only three books—a journal ledger, a cash and journal book, and a stock securities record, all of which were kept by the cashier of the National Bank of Kentucky. He insists that although the national bank and the holding company were separate corporate entities, their officers and directors interlocked—not entirely, however; and that 94.73 percent of the

stockholders of the national bank became stockholders of the holding company. The receiver introduced the evidence of a Certified Public Accountant that, from October 1, 1929, to November 22, 1930, the total income of the BancoKentucky Company was $1,307,662.29 and its total expense $97,413.24, leaving net income in the amount of $1,210,249.05; that dividends were distributed to its stockholders in the amount of $1,253,513, which was $43,263.95 in excess of its net income; and that the money to pay this deficit came from the National Bank of Kentucky and was met by an overdraft on that bank in the sum of $81,537.15.

Appellant asserts in his brief that the only assets of BancoKentucky Company, other than bank stocks, "were the few shares of life insurance company stock, the note of its president and the worthless assets taken over from the bank just preceding its collapse at the insistence of the National Bank Examiner."

■ Appellant insists that in dismissing the bill of complaint the district court failed to follow Barbour v. Thomas, 6 Cir., 86 F.2d 510, 516, wherein recognition was accorded the principle that "the actual owners of the capital of a national bank, that is, those who have their money invested therein, are 'shareholders' and liable to assessment."

In the case cited, it appears that the Detroit Bankers Company had been organized as a holding company to acquire the stock of five Detroit banks, including the First National. Stockholders of the respective banks exchanged their bank stock for stock in the holding company. None of the stock of the holding company was sold to the public or issued to any persons other than stockholders of the constituent banks, or their assignees.

The only assets of the holding company upon its organization were the bank stocks transferred to it by constituent units, in exchange for its stock, and $1,200 received from 120 "trustee shares" of no par value, issued to 12 persons composing a committee which served as agent and attorney for all stockholders who transferred their stock. Such trustee shares were nonparticipating in dividends, assets, or subscription rights, but were vested with exclusive voting power in the election of directors until the specified date at which they were to be redeemed at cost price, and retired and cancelled. The expenses of the holding company were met by a levy of "service charges" on its various units.

The opinion pointed out that inasmuch as the holding company possessed no substantial assets, except the stock of its component banks, creditors and depositors of the latter were afforded no real protection, either under the federal statute imposing double liability upon shareholders in a national bank, or under a similar statute of Michigan applicable to state banks.

Moreover, by express agreement, the stockholders of the holding company assumed its statutory liability as record holder of the bank stocks and agreed that such liability might "be enforced in the same manner and to the same extent as statutory liability may now or hereafter be enforceable against stockholders of banks or trust companies under the laws under which said banks or trust companies are organized to operate." This provision was printed on the reverse side of the holding company's stock certificate, leading to the court's comment that "there was no hardship on new stockholders or transferees because all were warned by the provision in the certificate." It was observed that the super-added liability imposed by the stockholders upon themselves constituted additional evidence that they regarded themselves as the true and real owners of the bank stocks, and that creditors and depositors should have "that real protection which the law demanded rather than an irresponsible promise, and that this vitally important matter should not be subject to any doubtful interpretation." The point, while deemed worthy of evaluation, was not considered controlling, however, for Judge Hicks said: "But, all this to one side, we are applying a federal statute in a suit by the receiver of a national bank to enforce the personal liability of its real shareholders for the benefits of its creditors and depositors."

The stockholders of the holding company were held to double liability assessment on the shares of stock of the First National Bank.

It would seem that the facts of Barbour v. Thomas, supra, are pointedly differentiable from those in the case at bar.

In the former case, the holding company sold no stock to the general public; it was capitalized exclusively by the exchange of its own shares for those of state and national banks, and only bank stocks were acquired; its stockholders expressly

assumed double liability assessment on the bank stocks held by it; and the corporation operated strictly within the scope of a typical holding company organized for the acquisition of bank stocks in one community.

In the case at bar, a large portion of its stock was sold by the BancoKentucky Company to the general public, for cash; the company accumulated a cash capitalization of several million dollars, in addition to stocks acquired by exchange of shares; its stockholders expressly assumed no liability for assessment on shares of stock which it owned, its charter provision being that "the private property of stockholders shall not be subject to the payment of corporate debts to any extent whatever"; in addition to its investment in bank stocks, the BancoKentucky Company purchased stock in an insurance company, the heavy obligation of a commercial corporation, the large note of one individual, and the smaller note of another; and an agreement was reached but not consummated to acquire large stockholdings in a non-banking corporation.

In sum total, the BancoKentucky Company conducted operations broader in scope, both territorially and in corporate financing, than did the holding company involved in Barbour v. Thomas.

In the opinion in Atherton v. Anderson, 6 Cir., 86 F.2d 518, 536, 537, which was filed on the same date upon which the decision in Barbour v. Thomas, supra, was announced, Judge Simons, in reviewing a record which had been incorporated as a part of the record in the instant case, said:

"But Banco was not a mere holding company for the bank's [National Bank of Kentucky's] stock. It was organized for clearly defined purposes, too optimistically conceived, perhaps, but neither illegitimate nor unlawful. It had its own capital with cash resources at one period almost twice the entire capital and surplus of the bank. While in the very beginning the bank stock may, as found by the court, have been its principal asset, and may have continued thereafter to be its most valuable single asset, it had other assets of very substantial value, and it was warrantable inference at the time of its organization and for a substantial period thereafter that it could well meet any assessment that might be levied upon it as a stockholder of the bank. At any rate there is nothing in the record to point to

its creation for the purpose of escaping such assessment. Indeed when the assessment was finally made by the Comptroller it was enforced against Banco and not against the stockholders. See Laurent v. Anderson, supra. Its separate corporate existence was recognized by the very receiver on whose behalf we are now asked to ignore it. * * *

"The BancoKentucky Company was certainly not a sham, for nearly $10,000,000 of actual cash paid for its stock attest its reality, and there is nothing in the record to point to it as an instrumentality of the bank. Nor was it organized for a fraudulent purpose or to conceal secret or sinister enterprises conducted for the benefit of the bank."

The additional evidence adduced in the case at bar, though on a different issue, presents no discernible reason for change in the court's previously expressed concept of the character of the BancoKentucky Company.

From our study of the record in this case, we are in accord with the conclusions of the district court that the BancoKentucky Company was not a mere holding company, a sham corporation, or an empty shell; but was a very real and live corporate entity, actively acquiring capital assets; that the corporation was organized for the purposes set out in its prospectus of July 19, 1929, and for no other; that it was conceived in no planned avoidance of double liability assessment upon stock of the National Bank of Kentucky; that the BancoKentucky Company was the true, legal and beneficial owner of the national bank stock; and that its stockholders were not stockholders of the national bank within the meaning of the federal assessment statutes. 38 Stat. 273, 12 U.S.C.A. 64.

Careful consideration has been given to cases from other jurisdictions which have been cited by the appellant. In none of these decisions has a court traveled the distance which this court is invited to go to hold stockholders in a corporation liable for statutory assessment upon stock held by the corporation in a state or national bank.

In Nettles v. Rhett, 4 Cir., 94 F.2d 42, 45, the holding company owned no other assets than bank stock, confining its investment to the shares of banks which were being merged into a chain. It appears from the opinion that when the merger

was completed the holding company "owned solely the 74,000 shares of the Peoples State Bank stock, which are the subject of this suit, and continued to hold them until the bank closed." The stockholders of the holding company, which was a record stockholder of a single bank, were properly held liable for assessment under a statute of South Carolina providing for double liability assessment upon the stock of insolvent state banks.

Metropolitan Holding Company v. Snyder, 8 Cir., 79 F.2d 263, 103 A.L.R. 912, is a far cry from the instant case. There, when a national bank was in shaky condition, its directors organized a holding company to purchase stock in the bank from a stockholder who was unable to make a voluntary contribution under a scheme whereby the bank stock would be re-sold at a profit which was to be paid to the bank to restore its impaired capital. In these circumstances, the holding company was found to be a mere agency and its individual stockholders were held to be beneficial owners of the bank stock, and liable to assessment as such.

Corker v. Soper, 5 Cir., 53 F.2d 190, 192, is even more remote to the situation confronted here. A national bank president organized a corporation, as his mere agent, to hold shares of stock in the bank. In holding him to double liability assessment when the bank failed, the court said that "the law will look through the subterfuge of pretended ownership to fasten liability upon the shareholder to whom, in fact, the shares belong."

In our judgment, Fors v. Farrell, 271 Mich. 358, 260 N.W. 886, is no more cogent in support of appellant's contention than was our decision in Barbour v. Thomas, supra. The court said at page 375 of 271 Mich., at page 891 of 260 N.W.: "It all comes to this: That neither an individual nor a corporation can through a trust arrangement or by other indirect means or circumlocution possess as an owner and enjoy the beneficial interest in bank stock without assuming the contingent liability of a stockholder's assessment imposed by law. To hold otherwise would be to nullify the protection given the bank creditors by the statute imposing double liability."

In a later opinion, Burrows v. Emery, 285 Mich. 86, 280 N.W. 120, 123, the Supreme Court of Michigan said, with respect to its earlier language just quoted,

that "this rule is not meant to lend aid to an effort to attack a bona fide corporate entity and hold shareholders of that corporation liable for a bank assessment levied upon bank stock which the corporation owns." Barbour v. Thomas, supra, was distinguished upon reasoning similar to our own. The Michigan court held that the stockholders of a "Securities Corporation" holding stock in a national bank were not liable for double assessment thereon, where such stockholders had assumed no liability for the assessment, and the holding company "dealt in a wide variety of stocks and bonds pursuant to the terms of its creation," and where "the history of the corporation persuades one to believe that it enjoyed a bona fide existence free from fraudulent intent to evade liability." Judge McAllister, now a member of this court, concurred in the opinion.

BancoKentucky's Receiver v. Louisville Trust Co.'s Receiver, 263 Ky. 155, 92 S.W.2d 19, was an action brought under Kentucky assessment statutes by the receiver of the Louisville Trust Company to recover judgment against BancoKentucky Company for its statutory double liability as a stockholder of the trust company. The Court of Appeals of Kentucky followed Laurent v. Anderson, supra, and held the BancoKentucky Company liable for the assessment as the real and beneficial stockholder under the Kentucky statute. There is no intimation in the opinion that the highest Kentucky court would carry statutory assessment liability beyond BancoKentucky Company to embrace individual liability of its stockholders.

Certain expressions in Laurent v. Anderson, supra, at pages 823, 824, of 70 F.2d, have direct bearing here and are therefore reiterated: "The stockholder's double liability is not contractual, but is imposed by statute as an incident of ownership. * * * To determine liability under section 64, the courts must disregard the forms of transactions and ascertain who is the real and beneficial holder of the stock. It has long been settled that the real and beneficial holder of bank stock is primarily liable for the double liability. * * * The evidence establishes that Banco was in every sense the true and beneficial owner of the national bank stock involved; the trustees holding only the bare legal title to the stock. * * * The petition and especially the evidence sustain recovery against Banco as the real and

beneficial owner under section 64 of the National Banking Act."

■ The BancoKentucky Company was a legal entity, separate and distinct from its shareholders. The record reveals no underlying purpose of those who organized it or invested in its shares to afford asylum to stockholders of a national bank, seeking escape from the rigidity of individual liability for double assessment. Banco was not a mere sham corporation, nor was it exclusively a holding company. It existed vitally as an independent corporation and not as a mere conduit for the flow of national bank-stock dividends to individuals. The corporation has been held liable as the real and beneficial owner of a large majority of the capital stock of a defunct national bank.

In our judgment, the reach of double liability assessment within the true meaning of the National Banking Act does not extend beyond the BancoKentucky Company to its stockholders.

The judgment of the district court is affirmed.