## ANDERSON v. ABBOTT et al.

### Equity No. 1046.

District Court, W. D. Kentucky,
at Louisville.

Aug. 8, 1945.

890

Nichols, Wood, Marx & Ginter, of Cincinnati, Ohio, for plaintiff.

Bullitt & Middleton, Dodd & Dodd, Allen, McElwain, Dinning & Clarke, Woodward, Dawson, Hobson & Fulton, David R. Castleman, Davis, Boehl, Viser & Marcus, James W. Stites, and J. Verser Conner, all of Louisville, Ky., for defendants.

SWINFORD, District Judge.

This case is now before me for a determination of the sufficiency of what have been denominated "The Special Defenses." It has been the endeavor of the attorneys, both for the defendants who are making these special defenses and those for the plaintiff, to classify them into distinct groups. It is my understanding from oral arguments and from briefs that the questions briefed are common to a great number of the defendants and that, while there may be distinguishing facts in each case, a ruling on the questions at law presented in briefs will largely determine the validity of all the defenses remaining.

This case has been before this court (32 F.Supp. 328), the Circuit Court of Appeals for the Sixth Circuit (127 F.2d 696), and the Supreme Court (321 U.S. 349, 64 S.Ct. 531, 88 L.Ed. 793, 151 A.L.R. 1146). Since the facts on which the plaintiff relied for recovery against all the defendants and the defenses common to all the defendants have been stated in these former opinions, I will not re-state them here except to the extent as may be necessary to a determination of the questions now presented.

The first class of special defenses which I shall consider are those designated as the "Distributee Class." It is raised by the plaintiff's motion to be allowed to file an amended complaint and the objections of the defendants who are affected by the amendment. The defendants who make this objection are the heirs of the holders of Banco stock. On February 20, 1931, the Comptroller of the Currency made an assessment on the stockholders of the Bank, payable April 1, 1931. Subsequent to that date, but before suit was instituted

to recover on the assessment, certain of the stockholders of Banco died.

The action to recover on the assessment was instituted on February 19, 1936. After filing the original petition, but prior to April 1, 1936, the plaintiff filed an amended petition in which it undertook to assert a claim for the stock assessment against the distributees of those stockholders who had died.

The two groups of distributees which are selected as representative of this class of defendants are Helen W. Dimmitt, as executrix of the estate of Addison Dimmitt, and the heirs of Belle W. Zellner. The allegations contained in the amended complaint, as affecting these distributees, are quoted as follows:

"Plaintiff states that at the time of the closing of the National Bank of Kentucky, as hereinbefore stated, Addison Dimmitt was the owner and holder of 500 shares of stock of Banco Kentucky Company; that since that time said Addison Dimmitt died and Helen W. Dimmitt was appointed Executrix of his estate. Proof of claim has been filed with said Executrix. Said estate has been settled and distributed and Helen W. Dimmitt was the heir, devisee and/or distributee. By reason of the foregoing, the defendant, Helen W. Dimmitt, Executrix and Distributee, is indebted to the plaintiff in the amount set out in Item 596 of Exhibit 'A' of the original Bill of Complaint."

"The allegations in the amended petition with reference to the Belle W. Zellner estate (paragraph 142) are as follows:

"Plaintiff states that at the time of the closing of the National Bank of Kentucky, as hereinbefore stated, Belle W. Zellner was the owner and holder of 1,980 shares of stock of Banco Kentucky Company; that since that time Belle W. Zellner died and Carl W. Zellner was appointed Executor of her estate. Proof of claim has been filed with said Executor. Said estate has been settled and distributed and Liberty National Bank & Trust Company, Trustee for Betty W. Zellner and Henrietta Zellner and Carl W. Zellner and Helen Z. Nairin, are the heirs, devisees and/or distributees. By reason of the foregoing, the defendants, Carl W. Zellner, Executor, and Liberty National Bank & Trust Company, Trustee for Betty W. Zellner and Henrietta Zellner, and Carl W. Zellner and Helen Z. Nairin, distributees, are indebted to the plaintiff in the amount set out in Item 2966 of Exhibit 'A' of the original Bill of Complaint."

As affecting all such parties, on July 31, 1939, the Receiver tendered an amended petition as follows:

"Now comes the plaintiff, A. M. Anderson, Receiver of the National Bank of Kentucky, an insolvent national banking association, organized under the laws of the United States, Louisville, Kentucky, and amends his Bill of Complaint and the previous amendments thereto, and for such amendment realleges all of the allegations contained in his Bill filed herein and amendments thereto and in addition thereto states, with respect to the defendants named in the Bill of Complaint and the amendments thereto as distributees and heirs of various persons who owned stock in the Banco Kentucky Company, that such defendants received, as legatees, devisees and distributees, from the estate of persons owning Banco Kentucky stock, as listed in the Bill of Complaint and amendments thereto, cash and personal and/or real property in the amounts set out in the Exhibit hereto attached and made a part hereof.

"Plaintiff states that said defendants named as legatees, devisees and distributees are liable for the payment of the claim against the person from whom they received such assets as hereinbefore set out.

"Wherefore: Plaintiff, A. M. Anderson, Receiver of the National Bank of Kentucky, an insolvent national banking association, organized under the laws of the United States, Louisville, Kentucky, prays as in his original Bill of Complaint and the amendments thereto."

This court, at the time, declined to permit this to be filed but directed that it be marked "tendered," subject to all objections and exceptions of all the defendants. It is on the motion to file this amendment that the question is now presented for determination.

A distributee is not liable for the debts of his ancestors except to the extent of assets received, K.R.S. 396.060, and before a recovery can be had it is necessary to allege and prove that he received assets from the ancestor. Cline v. Waters, 90 S.W. 231, 28 K.L.R. 679; Runyon's Adm'x v. Runyon, 237 Ky. 541, 35 S.W. 2d 894.

There can be no controversy with the general proposition in law that this statu-

tory enactment, as interpreted and applied by the Kentucky cases, must be fully complied with before there can be a recovery against the distributees. The question presented here, however, does not determine that there shall or shall not be a recovery. That fact is to be determined in the event the amendment is admitted to record.

I can find no reason why the court should decline to permit this amendment. All of the cases cited, both in oral arguments and in briefs, correctly hold that there should be no recovery until a full compliance with the statutory provision and that it should be charged and established by proof that the distributee had received assets from the debtor. The amendment expressly charges this. The first amendments were within the statutory period as they were filed prior to April 1, 1936. Anderson v. Abbott, D.C., 23 F.Supp. 265; and cases cited in that opinion.

Section 396.070 of the Kentucky Revised Statutes provides that the representative heir and devisee shall be chargeable for the liabilities of their decedent or testator to the extent of the assets received from the original decedent or testator. It is stated in the case of Fitzpatrick's Guardian v. First National Bank of Whitesburg's Receiver, 256 Ky. 93, 75 S.W.2d 754, that the estate of a deceased record owner of bank stock can be followed into the hands of the distributees and the assessment enforced to the extent of the amount of the estate which came into the hands of the distributee.

The court has determined that the stockholders of Banco Kentucky were subject to the statutory double liability as of April 1, 1931. The complaint, as amended in March of 1936, stated that the assets which were primarily bound for this assessment had passed into the hands of certain named defendants as distributees. The amendment of 1939 relates back to the allegations contained in the original amendment and does nothing more than to clarify and state more specifically what these distributees knew from the original amendment and in fact what they must have known from the original petition. It would seem now to be unjust to decline to permit an amendment to enable the recovery of a just debt.

Rule 15(a), Rules of Civil Procedure, 28 U.S.C.A. following section 723c, expressly provides that "leave shall be freely given when justice so requires" and (c) of the same rule provides that even though the claim was "attempted" to be set forth in the original pleading the amendment shall relate back to the date of the original pleading. In the recent case of McDowall v. Orr Felt & Blanket Co., 146 F.2d 136, 137, our Sixth Circuit Court of Appeals emphasized the importance of a liberal construction and the permitting of amendments, where justice required. In that opinion the court used the following pertinent language with citations of authorities:

"The only question which confronts us is whether appellant should have been permitted to file his amended complaint, and it is here unnecessary to discuss any legal or factual questions with regard to the content of the proposed amended pleading. Rule 15 of the Federal Rules of Civil Procedure provides that, in the circumstances disclosed in this case, a party may amend his pleading only by leave of court, or by written consent of the adverse party, 'and leave shall be freely given when justice so requires.' Subsection (a). The rule continues, confirms, and emphasizes the practice in effect prior to its adoption, in which liberality in amendment was encouraged and favored, where no prejudice or disadvantage was suffered by the opposing side. Norton v. Larney, 266 U.S. 511, 45 S.Ct. 145, 69 L.Ed. 413; Taylor Co. v. Anderson, 275 U.S. 431, 48 S.Ct. 144, 72 L.Ed. 354; In re Haskell, 7 Cir., 73 F.2d 879. To permit the submission of the actual facts, or what is contended to be the actual facts, of the present controversy, is here required for a just disposition of the case, and we are of the opinion that leave to permit the amended complaint should have been granted."

In the light of the above attitude of the courts it cannot be rightly said, as argued by the attorneys for the defendants, that the first amendment was no pleading at all, therefore there was nothing for this proposed amendment to relate back to.

An amendment which introduces a new or different cause of action is not an amendment, but where the original pleading, or as in this case the first amendment, contains allegations which advise, even though not clearly, the nature of the claim and the parties against whom it is being made, a later amendment stating more clearly and explicitly the same thing re-

lates back to the commencement of the action and is not affected by the intervening lapse of time. Seaboard Air Line Railway v. Renn, 241 U.S. 290, 36 S.Ct. 567, 60 L. Ed. 1006.

■ The whole purpose of the pleading and the whole purpose of the rule of laying down a policy of construction on procedural matters is to require nothing more than actual notice to the defendant of just what the plaintiff is claiming and why.

I cannot go beyond the present record in the consideration of this motion, but these distributees knew that in their inheritance, the estate of their ancestor was composed partly of assets identified as stock in Banco Kentucky and that Banco and all of its related corporations were in litigation to determine the extent of their assets. When the suit was filed on February 19, 1936, they also knew that the Receiver was seeking to have the court declare the stock subject to double liability. It would be a complete departure to now hold on a pure technicality that this clarifying amendment should not become a part of the record.

■ In the printed brief filed by Mr. Ben Washer and Mr. Edward Bloomfield, the point is made that had this amendment been tendered before the adoption of the new rules, it would have been subject to the "fatal" plea of limitation because Rule 15(c) was not effective until September 1938. Rule 15(c) is merely a concise statement of the law which was in existence at the time it was adopted. See 28 U.S.C.A. § 777; Woodard v. Outland, 8 Cir., 37 F. 2d 87; 6 Hughes, Federal Practice, Jurisdiction & Procedure, § 3602. This case was pending at the time the Rules of Civil Procedure became effective September 16, 1938. It is therefore subject to Rule 86.

Again I say that in an examination of the authorities cited by the defendants, there is nothing which indicates that had the plaintiffs in those cases followed the proper procedure, they would have been denied the right to introduce proof of claim. All of the cases appear to be those in which there was a complete lack of proof and no allegation. That is not this case and the amendment should be ordered filed. An order to that effect is this day entered.

The next class of cases has been designated as the "Agency" class. These involve the construction of a writing between certain Trust Companies and the owners of Banco Kentucky stock. The instance involving the stock of Morris B. Belknap is selected as typical of this class of cases. The agreement between Morris B. Belknap and the Fidelity and Columbia Trust Company is quoted as follows:

"This Agreement, made November 14, 1914, by and between, Morris B. Belknap (hereinafter called 'Principal'), and Fidelity and Columbia Trust Company, of Louisville, Kentucky (hereinafter called 'AGENT'),

"Witnesseth: That for and in consideration of the agreement hereinafter set forth, the Principal has this day assigned, transferred and delivered to the Agent the securities and other personal property belonging to the Principal, which are fully described in the schedule hereto annexed as part hereof, marked 'List of Securitits; Morris B. Belknap,' upon the following agreements;

"First: All of the securities and other property hereby transferred the Agent shall hold, manage and control, as agent for the Principal, with full power in the Agent to sell, assign, transfer and deliver any or all of said securities and other property so held by it, and to invest and reinvest in its discretion the proceeds of any such sale or sales. And in making investments the Agent is authorized and empowered to have certificates of stock issued in the name of the Fidelity & Columbia Trust Company, Agent for Morris B. Belknap.

"Second: The income arising from the property hereby transferred and delivered to the Agent shall be received by the Agent and the net income shall be paid by the Agent to the Principal in monthly or quarterly installments as may be directed by the Principal.

"Third: The compensation of the Agent for the management of the property hereby transferred or delivered shall be four percent. (4%) of the gross income from said property and said compensation shall be in full of all of the Agent's services hereunder, which shall include the care and management of the property embraced in this agreement, the safeguarding of all securities, the investment and reinvestment of funds, the keeping of accounts, the payment of charges and expenses, the rendering of periodical statements, the transfer to the Principal of the property held under this Agreement at the time of its termination, and the performance of all other

duties usually devolving upon an agent under an agreement of this kind.

"Fourth: This agency may be terminated by either party at any time at pleasure upon written notice to the other party; and upon such termination the securities and other property held hereunder shall be reassigned and transferred, or delivered back to the Principal.

"Fifth: This agreement, in all particulars, shall cover and control any property hereafter transferred by the Principal to the Agent to be carried in this Agency Account, and also any future investments of funds furnished by the Principal to the Agent with instructions to invest and carry same in this Agency Account.

"In testimony whereof, the parties hereto have hereunto subscribed their names in duplicate the day and year first above written.
"(Signed) Morris B. Belknap,
"(Signed) Fidelity & Columbia Trust Co.
 "By John T. Malone,
 "Manager."

It is contended by the Receiver that this instrument created a trust and that judgment should go against the Trust Company, as Trustee for Morris B. Belknap, thereby subjecting property in its hands of which Morris B. Belknap was the beneficial owner to the satisfaction of the judgment for double liability on the Banco stock, which appeared on the corporate stock books of Banco in the name of The Fidelity & Columbia Trust Co., as Agent for Morris B. Belknap.

This claim is asserted by reason of Revised Statutes, section 5152, 12 U.S.C.A. § 66, which is as follows:

"Persons holding stock as executors, administrators, guardians, or trustees, shall not be personally subject to any liabilities as stockholders; but the estates and funds in their hands shall be liable in like manner and to the same extent as the testator, intestate, ward, or person interested in such trust funds would be, if living and competent to act and hold the stock in his own name."

The defendant takes the position that this instrument of writing does not create a trust but is merely an agency contract, by which the Trust Company is privileged to act as agent for a designated purpose to relieve the principal of the active management and detail of a certain designated portion of his estate; that the defendant is thus not a "trustee" and not liable to the provisions of section 66 of Title 12 and that the Trust Company, as a defendant, should be dismissed.

There is thus squarely presented for determination the sole question: Does the contract between Morris B. Belknap and the Fidelity and Columbia Trust Company create the relationship of principal and agent or does it create the relationship of trustee and beneficiary?

In determining this question I have carefully examined the authorities referred to in briefs for both the plaintiff and defendants. A reading of these authorities and others which my own research discloses, instead of clarifying the question has added confusion. There seems to be no well defined rule of construction, no polar star to guide one in the determination of whether a given instrument creates a trust or the relationship of principal and agent. There are recognized rules of construction but their application in different cases does not reveal any consistent policy which the court may unerringly apply in reaching a definite determination. All the texts and authorities which I have examined could be forcefully presented as an argument to sustain this instrument as either an expressed trust or an agency agreement.

A trust involves control over property. The trustee holds legal title. The agent may hold legal title but usually does not hold any title at all. The trustee may act in his own name; the agent usually acts in the name of the principal. In the restatement of the law of trusts by the American Law Institute, the following enumerated distinctions are given:

"a. Title: A trustee has title to the trust property; an agent as such does not have title to the property of his principal, although he may have powers with respect to it.

"b. Control: An agent undertakes to act on behalf of his principal and subject to his control (see Restatement of Agency, § 1); a trustee as such is not subject to the control of his beneficiary, except that he is under a duty to deal with the trust property for his benefit in accordance with the terms of the trust and can be compelled by the beneficiary to perform this duty.

"c. Liability: An agent may subject his principal to personal liabilities to third persons; a trustee cannot subject the beneficiary to such liabilities (see § 274).

"d. Consent: An agency is created by the consent of the principal and the agent (see Restatement of Agency, § 1) a trust may be created without the knowledge or consent of the beneficiary or of the trustee (see §§ 35, 36).

"e. Termination. An agency can be terminated at the will of either the principal or the agent and is terminated by the death of either (see Restatement of Agency, §§ 118–121). A trust is not ordinarily terminable at the will of either the beneficiary or the trustee or by the death of either (see §§ 330, 337).

"f. Agent May Also Be Trustee: A person may be at the same time both an agent and a trustee for the same person. If an agent is entrusted with the title to property for his principal, he is a trustee of that property."

An illustration is given:

"1. A, the owner of shares of stock, delivers the certificates to the B Trust Company to hold and deal with as custodian, to receive the income and pay it to A, and with power to sell the shares and to reinvest the proceeds as A may direct. In order to carry out these purposes the shares are registered in the name of the trust company. The trust company is agent of A, and, since it holds the title to the shares because of the registration of the shares in its name, it is also trustee of the shares for A."

My examination discloses that where there has been a transfer of title it is usually held that a trust is created. Bullard v. City of Cisco, 290 U.S. 179, 54 S.Ct. 177, 78 L.Ed. 254, 93 A.L.R. 141; Clark v. Chase National Bank, etc., D.C., 45 F.Supp. 820.

The matter of transfer of title, however, cannot be considered as controlling. In Reily v. Fleece, 259 Ky. 330, 82 S.W.2d 341, 344, a writing which placed in the hands of the agent certain property including money and securities, with full power to invest and reinvest and to manage, control, and hold, was held to create a relationship of principal and agent and not that of trustee and cestui que trust. The following language from Corpus Juris, vol. 2, § 11, p. 425, was quoted with approval in the opinion:

"While agency is a trust or fiduciary relation demanding of the agent undivided loyalty and fidelity to the interests of the principal confided to his charge, it differs in many respects from any recognized class of trusts, although it may be difficult to define strictly, at all times, the line between a trustee and an agent. In the ordinary agency the title to any property involved, and usually to all the proceeds of the agency, remains in the principal, and the agent acts in the name of the principal, in a trust the legal title is in the trustee, and he acts in his own name. Agency may in general be revoked at any time; a trust can ordinarily be terminated only by the fulfillment of the purposes of the trust. It is the business of the agent to make contracts binding his principal to third persons; a mere trustee cannot render either the creator of the trust or the beneficiary liable to third persons. In this, as in the case of other relations that are sometimes difficult to distinguish from agency, the courts will construe the contract so as to give effect to the true intent of the parties, notwithstanding the name they may have given to their relation in the contract." See, also, 2 C.J.S., Agency, § 2.

It is said in 2 American Jurisprudence, section 6, that trustees and agents are chiefly distinguishable in the character in which they act and in the persons for whom they act. An agent acts for his constituent. On the other hand a trustee is established and may be generally defined as one with a vested estate in certain property for the benefit of another. The trustee is in fact the principal. 21 R.C.L. 817; Whiting v. Hudson Trust Co., 234 N.Y. 394, 138 N.E. 33, 25 A.L.R. 1470.

In the case of Louisville Trust Co. v. Glenn, D.C., 33 F.Supp. 403, 406, one John B. Pirtle entered into a written agreement with the Louisville Trust Company, under the terms of which Pirtle turned over to the Louisville Trust Co. his estate for handling and management for the express purpose of relieving him of the detail incident to the handling of the estate. In the opinion Judge Miller said:

"The court construes the agreement of June 7, 1926, between the Trust Company and Pirtle as creating the relation of principal and agent and not as the establishment of a trust estate. The instrument is styled 'This Contract of Agency * * *', and paragraph 7 refers to the securities held 'for said agency account.' The expressed purpose of the contract was to relieve Pirtle of the cares and details incident to the handling of his estate, and at the same time it retained in Pirtle the absolute control of all investments. Pirtle reserved the right to cancel the arrange-

ment upon ten days notice. The Trust Company was to receive no compensation. The evident intention of the parties was to enter into a contract of agency. The instument is to be construed in accordance with that intention. The transaction is controlled by the law applicable to principal and agent, and not by the rules governing trustee and beneficiary as cited by the plaintiff. See Reily v. Fleece, 259 Ky. 330, 82 S.W.2d 341."

This case was affirmed in Glenn v. Louisville Trust Co., 6 Cir., 124 F.2d 418. The distinction between principal and agent and trustee and cestui que trust was not discussed in the opinion in the Circuit Court of Appeals, except it was held that the court did not think it was important to determine whether or not the Louisville Trust Co. was trustee for Pirtle or merely his agent.

The distinguishing feature between the Louisville Trust Co. case and the instant case is that Pirtle retained the absolute control of all investments, while in this case the instrument places this responsibility upon the Fidelity & Columbia Trust Co.

 Notwithstanding the various rules of construction as recited in the authorities to which I have referred, and many others, this case must ultimately rest upon a construction of the particular instrument involved and the intention of the parties at the time this arrangement was made and the contract executed. I believe that some of the confusion in determining such questions arises by giving overdue consideration to the relation of the beneficial owner to the res rather than to the relation of the owner of the res to the person who has the res or estate in charge. In other words, it does not rest so much upon the control of the estate by the beneficial owner as the control of the agent or trustee by the beneficial owner. In the case of an express trust the beneficial owner has little or no control of the trustee. It is the duty and privilege of the trustee to manage and control the estate without regard to the wishes or desires of the cestui que trustent. An agent, on the other hand, is ever-mindful of the presence and desires of the principal, even though the principal has no active part in the management of the estate.

In the Restatement of the Law of Agency by the American Law Institute, on page 48, we find this language:

"Where it is otherwise clear that there is an agency relationship, as in the case of recognized agents such as attorneys at law, factors, or auctioneers, the principal, although he has contracted with the agent not to exercise control and to permit the agent the free exercise of his discretion, nevertheless has power to give lawful directions which the agent is under a duty to obey if he continues to act as such (see § 385). Where the existence of an agency relationship is not otherwise clearly shown, as where the issue is whether a trust or an agency has been created, the fact that it is understood that the person acting is not to be subject to the control of the other as to the manner of performance determines that the relationship is not that of agency."

Section 385 referred to in this quotation, which is found on p. 859 of the 2nd vol. of Restatement of the Law of Agency, provides:

"Except where he is privileged to protect his own or another's interests, an agent is subject to a duty not to act in matters entrusted to him on account of the principal contrary to the directions of the principal, even though the terms of the employment prescribe that such directions shall not be given."

 I would say further that the creation of a trust is a rarer and more exceptional transaction. It should be accompanied by more formality and less room for doubt than in the case of a mere agency agreement or power of attorney. It creates a separate estate where one is separated from his property and loses control over it. In case of doubt, the doubt should be construed in favor of the relationship of principal and agent rather than that of trustee and beneficiary. Courts should be slow to declare instruments, which at best raise a serious question, as taking property out of the control of the owner.

 The illustration which I have quoted above from the Restatement of the law of Trusts by the American Law Institute strongly favors the position of the plaintiff here. I do not believe, however, that it was the intention of the parties in the case at bar to create a trust. While it is true that the title to certain securities and certain sums of money were transferred to the Trust Co. by Belknap, the whole context of the instrument impresses me with the fact that Belknap did not lose control of the estate and, since he could terminate it at will, had an absolute check

upon the acts of the agent in the conduct of the affairs of the estate.

It should be noted that in this agreement the Trust Company is designated as "agent" rather than "trustee" and Belknap as "principal." Terminology may or may not be important. It is, however, a circumstance which the court may consider in connection with the execution of the writing and the whole transaction. The language used is only a prima facie indication and is not to be considered as determining the ultimate issue. In the early Kentucky case of Prewitt v. Clayton, 5 T. B. Mon. 4, 5, referred to in later opinions as the celebrated "bear" case, this view is well expressed in the opinion when it said: "A Bear, well painted and drawn to the like is yet the picture of a Bear, although the painter may omit to write over it, 'this is the Bear.' " See also Fox v. Faulkner, 222 Ky. 584, 1 S.W.2d 1079; Chicago, etc., R. Co. v. Des Moines, etc., Ry. Co., 254 U. S. 196, 41 S.Ct. 81, 65 L.Ed. 219; Colton v. Colton, 127 U.S. 300, 8 S.Ct. 1164, 32 L.Ed. 138.

In the case of United States v. Anderson, 6 Cir., 132 F.2d 98, 100, the appellee, Anderson, by writing, conveyed to the Hamilton National Bank of Knoxville, as Trustee, certain real and personal property with directions to hold all such property, collect the interest, income, dividends, and earnings therefrom and after deducting from such income a fee for its services, to pay the remainder to a church as beneficiary of the trust. The trustee was empowered to invest and reinvest the corpus of the trust but before reinvesting any of the property, it was required to obtain the consent and approval of the settlor of the trust, or in the event of his death, his executor. The purpose of this required consent, as stated, was to safeguard the interest of the beneficiary of the trust. The settlor reserved the right to vote all the stocks held by the trustee and the trustee was required to execute any proxies the settlor directed. The settlor retained the right to remove the trustee and the right to revoke the trust. In considering whether or not the instrument created a trust or the relation of principal and agent, our Sixth Circuit Court of Appeals said:

"The present writing establishes a technical trust only, with more of the characteristics of an agency. An agent undertakes to act on behalf of his principal and is subject to his control. On the other hand a trustee usually has discretionary powers and acts for a term. No discretion was lodged in the trustee here to dispose of any of the corpus of the trust without the consent of the settlor and the power to vote the corporate stocks was lodged exclusively in the settlor. The trust instrument gave to the trustee the right to resign at any time upon thirty days' notice and gave to the settlor the right at any time during the life of the trust to discharge the trustee by substitution and there was no prohibition in the instrument against the settlor being successor trustee. Where the owner of property transfers or delivers such property to another to hold and deal with as custodian, to receive its income and pay it as directed by the grantor, with power to sell the property and reinvest the proceeds as directed by the grantor, the relationship is one of agency in so far as the grantee deals in the property or collects its income. In so far as the grantee holds title to the property, the relationship is one of trustee and cestui que trust."

After a reading and a rereading of the instrument involved in this case, the fact that it was made and had been in effect some 15 or 20 years before the question arose, coupled with the further fact that the parties constantly used the words "agent" and "principal" and expressly provided that it might be terminated by either party, with the stock transactions carried upon the books of Banco in the name of the Fidelity & Columbia Trust Co. as "Agent" for Morris B. Belknap, convinces me that it was the intention of the parties and their understanding that there was only created a principal and agent relationship and there was never a thought that this property, or this res, was set aside as a trust fund.

From the practical standpoint of enforcing the double liability against the record owners of the stock, the Receiver should have little complaint. The true and beneficial owners, as well as the record owner, appeared on the face of the books of Banco. There was no concealment in any way of the identity of this true and beneficial owner. He could be sued, as any other debtor, in any court which had jurisdiction over his person. This was a transitory action and the Receiver could have followed him and prosecuted the claim against him wherever he could be found. It is suggested that the Receiver

did not have time to do this and that these beneficial owners were not all in the Western District of Kentucky and that it was impossible between the date of the filing of the first amendment and the limitation period of April 1, 1936, to find the true and beneficial owners. Such a contention does not present the true state of facts. There was nothing to prevent the Receiver from prosecuting the claim against these owners as they appeared on the books of the corporation from the day of the assessment in 1931. Because the Receiver chose to exhaust all other remedies and to wait until within a few days of the five year period of limitations, is no reason that he could not and should not have sought the remedy which he now seeks and have ascertained the whereabouts of the true and beneficial owners at any time within five years before April 1, 1936.

There is another circumstance which I think should be strongly considered and to which there should be attached great weight. The instrument was drawn and executed between Morris B. Belknap and the Trust Company. The principal was designating the Trust Company, which he called his agent, to handle certain funds which he chose to place in their hands for his account. Many of the cases construing instruments to determine whether there has been created a trust estate are those in which some third person has set aside, for a named beneficiary, real or personal property, to be handled and managed by a trustee. In other words, there is less likelihood that a person would voluntarily relinquish to a trustee a part of his estate than that he would employ an agent, for a certain fee, to look after his estate for him.

There are at least two instances in which the term "trustee" is used instead of the word "agent." While I have placed some emphasis upon the terminology, I do not think that these cases should be distinguished and it is my conclusion that all of the cases in which a similar instrument to the Belknap contract was executed be held to establish the relationship of principal and agent rather than of trustee and cestui que trust.

The third class of cases considered in the oral arguments and briefs are those which are identified as "Brokerage Cases." There is some difference in the instances pertaining to various ones of the brokerage houses concerned. I will not undertake to distinguish between them but will make this decision applicable to each of them, as I believe they are identical questions of law on the motions pending. These brokerage houses, J. J. B. Hilliard & Son, Almstedt Bros., Fidelity & Columbia Trust Co., W. L. Lyons & Co., J. L. Dunlap & Co., and Henning-Chambers, had filed motions for summary judgment under Rule 56, Rules of Civil Procedure.

The record, as it appears, establishes the fact that at the time the National Bank of Kentucky and Banco went into receivership, there appeared on the books, as the owners and holders of a number of shares of Banco stock, the brokerage houses above named. These brokerage houses, as developed by the record, were holding these stocks in the brokerage firm name, as brokers for the real and beneficial owners, presumably for the purpose of trading in stocks. It is contended by the defendants that since they were not the real or beneficial owners nor the record holders of bank stock that there was no liability and they are entitled to a judgment dismissing them as defendants in this action.

The identical question presented here was before the court in Joseph v. Bates et al., 7 Cir., 133 F.2d 457. In that case the court held that the broker stock-holders, since they were neither beneficial owners of the holding company stock nor record holders of the bank stock, were not liable for the assessment. There was a strong dissenting opinion by Circuit Judge Evans.

It should be pointed out here that Joseph v. Bates, supra, was decided on January 29, 1943, and the Supreme Court decided Anderson, Rec., etc., v. Abbott et al. on March 6, 1944. It is my opinion that the decision in Joseph v. Bates would have been in accord with the minority rather than the majority opinion had it been decided subsequent to the decision in the case at bar, in the light of the opinion by Mr. Justice Douglas. It is settled that one who permits shares to be carried on the books of a corporation in his name, although not the real owner, is subject to the statutory liability. Joseph v. Bates, supra, and cases cited.

The arguments of the defendants undertake to put the plaintiff in a dilemma. It is reasoned that all of the bank stock in question was transferred to Banco-Kentucky and that Banco was thus the record holder of the bank stock and consequently, as record holder, was jointly liable with the real and beneficial owner for the stat-

utory assessment. Consequently since the Receiver has exhausted his remedy against the record holder (Banco) in Laurent v. Anderson, 6 Cir., 70 F.2d 819, and since the brokers were admittedly not the real and beneficial owners of the stock, they fall within neither of the classes on whom liability may be fixed, as decided by the Supreme Court in Anderson v. Abbott, supra, and should be adjudged immune from liability in this motion for summary judgment.

I cannot bring myself to conclude that it was the intention of the Supreme Court in the opinion in this case, to limit the term "record holder" to apply only to record holders on the books of National Bank of Kentucky. It seems to me that the court applied the terms "record holder" and "beneficial owner" to the holder or owner of Banco stock and made Banco stock identical with Bank stock. That in so far as the liability of the stock holder was concerned, Banco lost its identity as a separate corporation and was treated as if its stock was the stock of the National Bank of Kentucky and its record books as if they were the record books of the Bank. Thus the record holder of stock was the record holder appearing upon the books of Banco. In other words, the stock books or record of stock holders of Banco were as if they were stock books or record books of the Bank and all holders, as they appeared on these books, were liable.

The question is: Who is a record holder? The Supreme Court identifies one who appeared as a stock holder on the books of Banco as the record holder of the Bank stock and any other interpretation of the decision in this case would, in effect, separate into various classes the stock holders of Banco, some of whom would be owners of Banco stock, subject to double liability, and some of whom would be owners of Banco stock not subject to double liability, although on the face of the record there was nothing to distinguish one from the other.

The brokerage houses here were laboring under the belief that an operating company, such as Banco, was not on the same plane as a bank and that since the double liability attached only to bank stock, there would be no statutory liability against a record holder for an undisclosed principal in Banco. That was the same conclusion reached by this court at the time it dismissed the bill, 32 F.Supp. 328, and by the Circuit Court of Appeals in its sustaining decision, 127 F.2d 696. That decision was held by the Supreme Court to be erroneous, 321 U.S. 349, 64 S.Ct. 531, 88 L.Ed. 793, 151 A.L.R. 1146, and the case was reversed and remanded to the District Court for judgment in favor of the Receiver.

It is the ruling of the Supreme Court that, in so far as liability is concerned, Banco stock is on an identical basis with Bank stock and subject to the statutory provisions dealing with bank stocks. The two are indistinguishable. Since a record holder of an undisclosed principal of bank stock is liable, then a record holder of an undisclosed principal of Banco stock is liable. Regardless of the correctness or incorrectness of the majority or minority view in Joseph v. Bates, supra, the opinion of the Supreme Court in Anderson v. Abbott is the law of this case and leads unerringly to the conclusion that since Banco stock and bank stock share identical statutory positions as to liability and the statute makes the record holder liable, then the record holder of Banco is liable for the assessment.

This is in reality a case of an undisclosed principal, which is the law of agency giving force to the rule that one who permits his name to appear on the books as record holder, cannot later avoid an assessment by saying that he neither owned nor had any beneficial interest in the stock.

In Joseph v. Bates, supra, the distinction between bank stock and holding company stock was based on the proposition that a depositor or creditor of the bank could tell from examining the books of the bank who were the stock holders of the bank but they did not have access to the stock books of the holding company, which was a private corporation, and consequently no deposit was made and no credit extended on the basis of the ownership of stock in the holding company. Consequently, the opinion reasons, the reason for double liability on holding company stock fails since no estoppel could be sustained against the stock holders of record of the holding company. The Supreme Court, in the case at bar, ignored this distinction as purely theoretical and held that it is not available to an owner of holding company stock. Had the depositor or creditor examined the books of the National Bank of Kentucky he would have seen that Banco was the owner of the bank stock and the books of Banco would have re-

vealed that the stock of Banco was held by the brokerage firms without any designation of the beneficial owner. If I understand the opinion of the Supreme Court it is at this point that the doctrine of estoppel applies and the brokerage firm cannot deny that it is the holder of Bank stock any more than an individual, whose Banco stock appeared in his name, could deny that he was the holder of Bank stock.

In the dissenting opinion in Joseph v. Bates, this point is summarily and satisfactorily treated. The dissenting judge said [133 F.2d 460]:

"Defendants assert a difference between the status of the holder of record of the bank stock and holders of record of the stock of a holding company which owns the bank stock, based on the doctrine of estoppel which is predicated upon the fact that said holders of bank stock cause their names to be of record and available to any depositor who might wish to inquire. As the names of the stockholders of the holding company are not thus available, there is no liability as against them. This is their sole avenue of escape."

After discussing the applications of estoppels in pais and by deed, he concludes:

"I am convinced that while there is language in the decisions about estoppel as a basis for holding record holders of stock of national banks, these estoppel references are vague and confusing. Obviously and certainly there can be no equitable estoppel or estoppel in pais, without reliance by the depositors. Yet the courts have uniformly held stockholders of record liable without a showing of reliance on their appearance as record stockholders. Liability then must be based on something other than equitable estoppel."

It has been held in this case that owners of Banco stock, who purchased the stock upon the market without ever having held Bank stock, were subject to the double liability. This fact alone eliminates any distinction between the holders of Banco stock.

It is further urged in these brokerage cases that the Receiver, by his own delay in waiting for nearly five years to file his suit, created a situation in which the defense of limitation became available to the purchasers of these shares, and thus because the Receiver was guilty of laches, these broker defendants should be dismissed.

There could be no laches where there was a period of limitation and the action was brought within that period. The Receiver was given five years in which to prosecute his claim for double liability. This period is considered reasonable and proper for actions of this nature. If it is proper there is no compunction on a plaintiff to seek his remedy any earlier than he deems necessary. If the delay has occasioned loss to the brokerage firms, it is their own fault. They need not have carried stock subject to double liability in a "street" name. They were notified in 1931 that the assessment was made and they would be required to pay it. If they failed to proceed against their clients through an erroneous understanding of the law as to their liability, it was no one's fault but their own. The law of this case as set forth in the opinion in 321 U.S. 349, 64 S.Ct. 531, 88 L.Ed. 793, 151 A.L.R. 1146, was the law in so far as this question was concerned on April 1, 1931. Equity will not apply the doctrine of laches to relieve one of ignorance of the law. If the period of limitation on a claim such as this is too great, the remedy lies with the legislature not with a chancellor.

I must conclude that the motions for summary judgments must be overruled and an order to that effect is this day entered.

There is yet another class of cases which were presented in oral arguments and briefs and which are denominated the "Cases of Limitations." These cases affect about seven individuals and I feel that the decision which I have reached should apply equally to all of them.

While K. A. Tashgian is in somewhat different factual position from the other defendants in this category, since Mr. Tashgian, in a representative capacity as executor of his father's estate, was properly summoned and before the court at all steps of this proceeding, I do not feel that his present rights should be affected by that fact and consequently, as I have said, apply this ruling to him as well as to the other defendants.

The parties are in agreement as to the facts. Neither is there any difference of opinion on the law. The only question is the application of the law to the facts in this particular situation.

As has been pointed out in discussion of other questions in this opinion, this case to recover the assessment was instituted on

February 19, 1936, about forty days before the date the five year statute of limitations became effective. Process against each of the defendants was issued. As to these defendants who are here relying on limitation, the process was returned, within a few days after it was issued, unexecuted and noted "not found." No alias summons was requested and consequently none was issued. Each of these defendants lived in Louisville and were not in any way concealed or obscured from being found by the process officer. With the record in this condition motions were heard, and passed upon by the court in a somewhat extended opinion. 23 F.Supp. 265. The case was heard on its merits and decided in another opinion. 32 F.Supp. 328. The case was appealed to the Circuit Court of Appeals for the 6th Circuit, where the decision of the lower court was affirmed. 127 F.2d 696. The appellant then petitioned the Supreme Court for writ of certiorari, which was granted, 317 U.S. 619, 63 S.Ct. 259, 87 L.Ed. 502, and the case was decided and reversed on March 6, 1944. 321 U.S. 349, 64 S.Ct. 531, 88 L.Ed. 793, 151 A.L.R. 1146. There was a petition for rehearing, which was denied on April 3, 1944. 321 U.S. 804, 64 S.Ct. 845, 88 L.Ed. 1090. In due season the mandate was issued and the case was ready for judgment on the main questions involved, common to all defendants, in May, 1944. After all of this, it was discovered that the defendants now under consideration were not and had never been before the court. An alias summons was caused to issue and they appear here for the purpose of making this question.

There is thus presented for determination the single proposition of whether or not one who has been named a defendant by an action instituted within the period of limitation, in which process has issued, been returned unexecuted and no other process requested for a period of more than eight years (more than three years beyond the five year period of limitation), can be held subject to liability.

The whole law on the question is found in Clark v. Kellar, 3 Bush 223, 66 Ky. 223. This opinion contains two paragraphs from which I quote:

"It being about five years after the last process and return of not found until another process was sued out and executed, and Kellar residing all this time in the city of Louisville, where he resided when the account for merchandise was created, authorized the special finding of the jury that the suit had not, in good faith, been prosecuted. To prevent the statute of limitations from running, a suit must be brought and prosecuted in good faith; and, if the time constituting the bar is permitted to elapse between the suing out of one process until another, the mere bringing the suit will not prevent the statute from running, and is no legal reason why the bar should be disallowed."

This case has been referred to in a number of later decisions and the rule has in no wise been qualified or changed and as stated above is agreed, between the parties here, to be the law of this case. See Louisville & Nashville R. Co. v. Hall, 115 Ky. 567, 74 S.W.2d 280; City of Louisville v. Meglemry, 107 Ky. 122, 52 S.W. 1052.

The case thus resolves itself into whether or not it was prosecuted by the plaintiff in good faith. There can be no question but that the case, itself, was prosecuted in good faith since the plaintiff carried it to a successful conclusion, but that is not the determining factor. The real point is whether or not it was prosecuted in good faith against these particular defendants. I have no doubt of the good faith of the plaintiff endeavoring to recover against all stock holders, but good faith must necessarily imply diligence and that diligence must pertain to each defendant. Not only the plaintiff's cause, but that of each defendant should have the benefit of proper consideration of the court and by proper consideration is meant that each party should have the privilege of presenting his case before it becomes stale and before circumstances change. That is the whole purpose of the statutes of limitation, recognized as equitable enactments.

A person who has a right of action is permitted to present it in court and prosecute it to final judgment and recovery. The party against whom the proceeding is brought must respond and set up what defense or defenses he has. Those defenses may be valid and may be successfully presented when reasonably fresh but when they have become stale they are difficult, and sometimes impossible to present. It is a matter of justice not to require a defendant to make a defense when the delay was caused through no fault of his but only through the indifference of the plain-

tiff. This is beautifully expressed in Wood v. Carpenter, 101 U.S. 135, 139, 25 L.Ed. 807:

"Statutes of limitation are vital to the welfare of society and are favored in the law. They are found and approved in all systems of enlightened jurisprudence. They promote repose by giving security and stability to human affairs. An important public policy lies at their foundation. They stimulate to activity and punish negligence. While time is constantly destroying the evidence of rights, they supply its place by a presumption which renders proof unnecessary. Mere delay, extending to the limit prescribed, is itself a conclusive bar. The bane and antidote go together."

This language is approved by the Kentucky Court of Appeals in Louisville & Nashville R. Co. v. Hall, supra.

The plaintiff insists that this is a class action and that all members of the class are bound by the decision. This is not a class action as I understand the term. A class action is more in the nature of a derivative suit, where a member of a class may proceed for the benefit of all, where all have a common interest.

It is true, as said in the opinion of this court on motions, 23 F.Supp. 265, that many of the questions are common to all the defendants but, as pointed out in that opinion, Rule 23 will adequately protect the individual defendants in the presentation of their several defenses. Here the Receiver did not sue one or a small group, but sued and is seeking a present judgment against these particular defendants who have, or may have, or may have once had, absolute defenses. The whole purpose of the limitation is to make it unnecessary to present a defense to a stale claim. I believe that, in so far as these defendants are concerned, the case has not been prosecuted in good faith and the statute of limitation should apply and they should be discharged from liability.

Since there may be a number of persons affected by this ruling and the record is so voluminous that I do not profess to know just what motions, as pertain to each defendant, are now pending, the attorneys representing the various defendants who fall in this classification may submit proper orders, in accordance with their respective motions, as indicated by this ruling.

The case of John C. Thompson, administrator of the estate of Nannie C. Thompson, does not come within this class. It is stipulated in this particular case that John C. Thompson was acting as administrator of Nannie C. Thompson, who had died prior to the time when the trustee participation certificate for the stock of the National Bank of Kentucky and the Louisville Trust Company was issued in 1929; that since John C. Thompson was acting as administrator of Nannie C. Thompson these certificates were issued to him as administrator. He was discharged as administrator but continued to hold the stock in his name, as administrator of the estate of Nannie C. Thompson. There was no reason for him to continue to do business for himself in the name of John C. Thompson, administrator of Nannie C. Thompson, but if he preferred to do this, he cannot now claim that since the stock appeared in that name, by his own choosing, he is exempt from liability. The term "Administrator of Nannie C. Thompson" meant nothing and since he was summoned in that name, but with full knowledge of all the facts, his defense on that ground must fail.

The case of Baumeister v. Markham, 101 Ky. 122, 39 S.W. 844, 845, 41 S.W. 816, 72 Am.St.Rep. 397, lays down the rule in the following language:

"The question, then, arises whether a judgment may be affected by being rendered in the assumed, instead of real, name of a plaintiff.

"It is a rule of practice, recognized by this court, that if the defendant to an action, though sued in the wrong name, was in proper person before the court, and litigated with the plaintiff about the subject of controversy, a judgment against him on the merits of the case is as valid and effectual as if he had disclosed, and the action had been rendered in, his true name."

I must therefore conclude that the judgment against John C. Thompson, administrator of Nannie C. Thompson, is a judgment against John C. Thompson individually.